# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MICHAEL FONG,<br>Plaintiff,<br>v.<br>TERRASCEND CORP.;<br>GAGE GROWTH CORP. (f/k/a Wolverine Partners Corp.; n/k/a TerrAscend Growth Corp.);<br>RADICLE CANNABIS HOLDINGS INC.;<br>RADICLE MEDICAL MARIJUANA INC.;<br>AEY HOLDINGS LLC;<br>AEY CAPITAL LLC;<br>SPARTAN PARTNERS CORPORATION;<br>SPARTAN PARTNERS HOLDINGS LLC;<br>COOKIES CREATIVE CONSULTING & PROMOTIONS, INC. (successor by conversion to Cookies Creative Consulting & Promotions LLC);<br>COOKIES SF LLC;<br>CANOPY GROWTH CORPORATION;<br>RIV CAPITAL INC. (f/k/a Canopy Rivers Inc.);<br>CANOPY USA, LLC;<br>JASON WILD;<br>BRUCE LINTON;<br>LYNN GEFEN;<br>FABIAN MONACO;<br>DAVID WATZA;<br>MICHAEL HERMIZ;<br>MICHAEL FINOS;<br>RAMI REDA;<br>YOUSSEF REDA;<br>ZIAD REDA;<br>ZIAD GHANEM;<br>GILBERT MILAM, JR. (publicly known as "Berner"); | Case No. 4:26-cv-12872<br>Hon. Shalina D. Kumar<br>Mag. Judge Elizabeth A. Stafford |

JENNIFER LYNN DOMINGUE;
BARTON W. MORRIS, JR.;
CANNABIS LEGAL GROUP (a/k/a "The Law Offices of Barton W. Morris, Jr."); and
DOES 1–10,
Defendants.

**FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

**FIRST AMENDED VERIFIED COMPLAINT.** Pursuant to Federal Rule of Civil Procedure 15(a), this First Amended Verified Complaint amends and supersedes the original Verified Complaint in its entirety.

# TABLE OF CONTENTS


PRELIMINARY STATEMENT....5
I. NATURE OF THE ACTION....6
II. JURISDICTION AND VENUE....9
III. THE PARTIES....15
A. Plaintiff....15
B. Corporate Defendants....16
C. Individual Defendants....27
IV. PLAINTIFF'S MARKS AND PRIOR USE....34
V. OPERATIVE FACTS....46
A. The TerrAscend-Gage Enterprise....46
B. The September 16, 2019 Insider Transfer....52
C. The Wolverine Form 1-A Omissions....60
D. The October 12, 2020 License Agreement....61
E. The TerrAscend Acquisition....61
F. The AEY Capital / AEY Holdings Alter-Ego Operation....62
G. The 2025 Michigan Exit....63
H. The 2025–2026 Asset Extraction, Receivership, and Abandonment....64
I. The 2026 TTAB Judgment and Post-Judgment Concealment....71
J. The Cookies Web-Presence Priority Anchor....72
K. The Domingue Conflict of Interest....73
L. The Defendant Domain Portfolio....75
VI. COUNT I — False Designation of Origin, Unfair Competition, and Infringement of Registered and Unregistered Marks under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)....77
VII. DEFENDANTS' DOMAIN-REGISTRATION CONDUCT AS EVIDENCE OF BAD FAITH AND WILLFUL INTENT....97
VIII. COUNT II — Civil RICO under 18 U.S.C. § 1962(c)....99
A. The Enterprise....100

B. Pattern of Racketeering Activity....103
C. Continuity Plus Relationship....110
D. Injury to Plaintiff in Plaintiff's Business or Property....119
IX. COUNT III — RICO Conspiracy under 18 U.S.C. § 1962(d)....126
X. COUNT IV — Void Title and Fraudulent Transfer (Michigan Uniform Voidable Transactions Act, MCL 566.31 et seq.) and Constructive Trust....129
XI. THE DOMINGUE–MORRIS CONFLICT RECORD AS EVIDENCE OF ENTERPRISE KNOWLEDGE AND INEQUITABLE CONDUCT....136
XII. PRAYER FOR RELIEF....138
XIII. DEMAND FOR JURY TRIAL....139
VERIFICATION....141
CERTIFICATE OF SERVICE....142

## PRELIMINARY STATEMENT

*Aequitas respicit substantiam, non formam* — equity regards substance rather than form. 1 J. Story, *Commentaries on Equity Jurisprudence* vol. 1, at 64 (1836); 3 W. Blackstone, *Commentaries on the Laws of England*, at 430–31. This action invokes that maxim against a publicly-traded enterprise that erected the *form* of a Canadian-corporate trademark portfolio and an acquisition announced at approximately $545,000,000 (Paragraph 41) over the *substance* of Plaintiff's continuous commercial use of the GAGE family of trademarks in interstate commerce, documented since 2011 ([Exhibit N]) and claimed since 2008. Plaintiff invokes the equitable as well as legal jurisdiction of this Court to restrain that misappropriation, impose a constructive trust over its traceable proceeds, and afford full relief at law and in equity.

Plaintiff MICHAEL FONG, appearing in propria persona, brings this action as the senior principal of Gage Green Group to whom the bona fide commercial use of the GAGE family of trademarks and the goodwill accruing therefrom are attributable, against TerrAscend Corp. (a publicly-traded Ontario, Canada corporation, SEC CIK 0001778129) and the affiliated network of entities and individuals identified below, on federal-question jurisdiction under the Lanham Act and Civil RICO, with supplemental jurisdiction over related Michigan state-law claims. Venue is laid in the Eastern District of Michigan because a

substantial part of the events giving rise to the claims occurred in this District through the operation of approximately twenty (20) Michigan-licensed cannabis retail locations under the misappropriated GAGE brand.

## I. NATURE OF THE ACTION

1. This action arises from a coordinated, multi-year scheme to misappropriate the GAGE / GAGE GREEN / GAGE GREEN GROUP family of trademarks (collectively, the "GAGE Marks"), to misappropriate the goodwill those marks accrued through Plaintiff's continuous commercial use (documented since 2011 and claimed since 2008), and to convert that misappropriated brand equity into a publicly-traded enterprise — a transaction announced in 2021 at an approximately $545,000,000 value and closed in March 2022 at an approximately $386,000,000 realized value (Paragraph 41) — with neither disclosure nor compensation to Plaintiff. The operative facts summarized here are pleaded with particularity in Paragraphs 31 through 56 and anchored to primary-source exhibits, including [Exhibits H-M] (TerrAscend and Wolverine SEC filings).

2. Plaintiff is the founder and principal of Gage Green Group ("GGG"), an institutional cannabis-genetics steward that has used the GAGE Marks continuously in interstate commerce across multiple Nice International

Classification classes, documented since 2011 and claimed since 2008. See [Exhibits A-D] (TTABVUE Opposition Nos. 91278331 and 91252169); [Exhibit N] (Wayback Machine status-200 capture of gagegreen.org, July 9, 2011, titled "Gage Green Genetics" with the masthead "Serving the finest cannabis for connoisseurs in the medical community").

3. On May 6, 2026, the United States Patent and Trademark Office Trademark Trial and Appeal Board ("TTAB") entered a final judgment with prejudice against Gage Growth Corp. in Opposition No. 91278331 on Rule 2.128(a)(3) failure-to-prosecute grounds. See [Exhibit A] (TTABVUE Entry 41). Plaintiff's federal trademark filings survive that judgment — including Serial No. 90324487, which matured into Registration No. 8,268,743 (GAGE GREEN GROUP), and Serial Nos. 90746550 and 97251818 (applications pending).

4. In Opposition No. 91252169, decided April 29, 2025, and reconsideration denied July 11, 2025, the TTAB found the GAGE mark **inherently distinctive** for marijuana **and not generic**. See [Exhibits C and D] (TTABVUE 91252169 Entry 78 at 56-58 (distinctiveness and non-genericness findings); Entry 84 (reconsideration denial)). The Board dismissed Plaintiff's predecessor-opposers' Section 2(d) opposition on the ground that priority of common-law use was not established by a preponderance on the registration-opposition record, and

**expressly declined to reach likelihood of confusion**; the Board did not adjudicate the marketplace usages at issue in this action. Plaintiff establishes priority and likelihood of confusion **de novo** in this Court through the continuous-use evidence pleaded below.

5. Notwithstanding the TTAB record, Defendant TerrAscend Corp. filed its Fiscal Year 2025 Form 10-K on March 12, 2026 — the same day the TTAB issued its Show-Cause Order in Opposition No. 91278331 — without disclosing either the opposition or its imminent default posture. See [Exhibit I] (SEC EDGAR CIK 0001778129, FY2025 Form 10-K filed 2026-03-12). On May 7, 2026, one day after the May 6 final judgment, TerrAscend filed its Q1-2026 Form 10-Q without subsequent-event disclosure. See [Exhibit J] (SEC EDGAR CIK 0001778129, Q1-2026 Form 10-Q filed 2026-05-07).

6. The defendants identified above, together with Does 1–10, conducted an enterprise — through a pattern of mail fraud, wire fraud, and related-party non-arms-length transfers — that misappropriated the GAGE Marks, defrauded Plaintiff, and defrauded the Michigan Cannabis Regulatory Agency. Plaintiff seeks (a) trademark injunctive relief and damages under the Lanham Act, (b) treble damages under Civil RICO, (c) avoidance under the Michigan Uniform Voidable Transactions Act, and (d) common-law remedies including

disgorgement of the TerrAscend acquisition consideration — announced at approximately $545,000,000 and valued at approximately $386,000,000 at the March 10, 2022 closing (Paragraph 41) — as constructive trust. See [Exhibits H, I, J, K] (TerrAscend SEC filings) and [Exhibit G] (Michigan CRA Consent Order ENF 22-00499).

## II. JURISDICTION AND VENUE

7. This Court has federal-question subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1338 (Lanham Act and federal trademark claims) and 18 U.S.C. § 1964 (Civil RICO), with supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. The enterprise operated GAGE-branded cannabis retail locations within the Eastern District of Michigan — including Detroit (Wayne County), Ferndale (Oakland County), Burton (Genesee County), and Adrian (Lenawee County), each within this District under 28 U.S.C. § 102(a) — and the Michigan licensee entities AEY Holdings LLC and AEY Capital LLC conducted operations under the assumed name "Gage Cannabis Company" (Michigan LARA Certificate of Assumed Name, Document No. 27835986, filed January 15, 2026, in effect

through December 31, 2031). Plaintiff's own GAGE-branded commerce in this District likewise predates the enterprise's Michigan entry: the 2014 "Gage Green" purchase orders pleaded in Paragraph 31(d)(iii) shipped GAGE GREEN genetics to Jackson (Jackson County) and Oxford (Oakland County), Michigan — both within this District under 28 U.S.C. § 102(a)(1) — four years before the enterprise's October 2018 Michigan brand launch. See [Exhibit N-5]. Defendant Cannabis Legal Group and Defendant Barton W. Morris, Jr. maintain offices, and Defendant Domingue committed the conflict-of-interest acts pleaded in Section XI, in Royal Oak, Oakland County — within this District. The enterprise's twenty (20) Michigan-licensed retail locations — nine "Gage"-branded (Detroit, Ferndale, Burton, Lansing, Kalamazoo, Grand Rapids, Traverse City, Battle Creek, and Adrian), five "Cookies"-branded (Detroit, Ann Arbor, Jackson, Oxford, and Kalamazoo), five "Pinnacle Emporium"-branded (Morenci, Camden, Edmore, Addison, and Buchanan), and one "Lemonnade"-branded (Centerline) — are enumerated by name and street address in TerrAscend's own June 30, 2025 Form 8-K location schedule ([Exhibit K]); those within this District supply the substantial in-District commercial contacts that establish venue, and Plaintiff does not contend that every enumerated location lies within this District. Section 1391(b)(2) requires only that a

substantial part of the events occurred here, which the in-District GAGE operations, the AEY licensee conduct, and the Royal Oak attorney-conflict acts independently satisfy. *See First of Mich. Corp. v. Bramlet*, 141 F.3d 260 (6th Cir. 1998) (venue under § 1391(b)(2) is established by the location of a substantial part of the events giving rise to the claim, independent of any defendant's residence or place of incorporation).

9. Personal jurisdiction over each Defendant is conferred by (a) Michigan's long-arm statute — MCL 600.705 (limited personal jurisdiction over individuals) as to the individual Defendants, and MCL 600.715 (limited personal jurisdiction over corporations) as to the corporate Defendants — for those Defendants who transacted business in Michigan, caused tortious injury in Michigan, or used the GAGE Marks in Michigan; and (b) Federal Rule of Civil Procedure 4(k) for the federal-question claims, including 18 U.S.C. § 1965(b) as to the Civil RICO claims (Paragraph 9A). For Defendants resident in Canada and Defendants resident outside Michigan, service shall be effected through the Hague Convention or by waiver under Federal Rule of Civil Procedure 4(d).

9A. **Personal jurisdiction over the Canopy Defendants; service of the foreign Canopy Defendants.** This Court has personal jurisdiction over Defendants Canopy Growth Corporation and RIV Capital Inc. (together, the

"Foreign Canopy Defendants") and over Defendant Canopy USA, LLC. First, on the federal Civil RICO claims (Counts II and III), 18 U.S.C. § 1965(b) authorizes nationwide service of process to summon the out-of-District United States participants in a single RICO enterprise — the California, Connecticut, and Florida Defendants, including Defendant Wild, a Florida resident (Paragraph 19) — once the Court has personal jurisdiction over at least one Defendant properly venued in this District under § 1965(a). That anchor is satisfied here by the Michigan-resident Defendants (Paragraphs 15–16, 18, 24, 28–29A), who reside, are found, have agents, and transact their affairs in this District within the meaning of § 1965(a) through the enterprise's nine (9) Michigan GAGE-branded retail locations (Paragraphs 8, 43-45). *See Peters Broadcast Eng'g, Inc. v. 24 Capital, LLC* (6th Cir. 2022) (Section 1965(b), not Section 1965(d), supplies civil RICO's nationwide jurisdictional reach, which hinges on at least one defendant's minimum contacts with the forum State); cf. *Medical Mut. of Ohio v. deSoto*, 245 F.3d 561, 566–68 (6th Cir. 2001) (applying, by analogy, a parallel federal nationwide-service provision and its minimum-contacts anchor). The ends of justice require summoning those out-of-District United States Defendants before this Court under § 1965(b): because the members of the single enterprise pleaded herein reside in Michigan,

California, Connecticut, Florida, and Ontario, no other single judicial district could exercise personal jurisdiction over all of them, so haling them into this District — where the enterprise's retail operation and the bulk of the pleaded conduct occurred — is necessary and not merely convenient. Section 1965(b) is a domestic nationwide-service provision reaching persons servable within a judicial district of the United States; it is not asserted as the basis for jurisdiction over the Foreign Canopy Defendants abroad, whose amenability to suit rests on the independent predicates set out next. Second, and independently, Federal Rule of Civil Procedure 4(k)(2) confers jurisdiction over the Foreign Canopy Defendants on the federal-law claims, because they are not subject to the general jurisdiction of any single State and the exercise of jurisdiction upon their aggregate United States contacts comports with the Due Process Clause of the Fifth Amendment. Third, the Foreign Canopy Defendants purposefully directed their conduct at Michigan within the meaning of *Calder v. Jones*, 465 U.S. 783 (1984): they funded and seeded, and through Defendant Linton chaired, an enterprise that deliberately built a saturating Michigan retail operation under the misappropriated GAGE brand (Paragraphs 33A-33C, 43), maturing into the nine (9) Michigan GAGE-branded retail locations (Paragraphs 8, 43-45), and the resulting injury landed upon Plaintiff, a Michigan plaintiff.

The Foreign Canopy Defendants' documented United States contacts include their counterparty roles in the October 8, 2018 Arrangement Agreement reorganizing the United States-market acquirer (Paragraph 33C; [Exhibits DD, I]) and Canopy Growth Corporation's direct holding of 19,445,285 TerrAscend Exchangeable Shares (Paragraph 33C; [Exhibit EE]). Fourth, Defendant Canopy USA, LLC is a United States entity subject to this Court's jurisdiction on its own United States contacts, including its holding of 24,601,467 TerrAscend Exchangeable Shares acquired in the December 9, 2022 arrangement (Paragraph 33D; [Exhibit I]). Service upon each Foreign Canopy Defendant — Canopy Growth Corporation, a corporation existing under the federal laws of Canada with a registered office in Ontario, and RIV Capital Inc., an Ontario corporation — shall be effected under the Hague Service Convention by transmission of a completed Request for Service Abroad, the summons, and the Verified Complaint — in English, no French translation being required for Ontario — to Canada's Central Authority competent for Ontario under Article 5(a), with service by an Ontario process server under Article 10(b) as a parallel channel (Canada having lodged no objection to Article 10), and with a request for waiver of service under Federal Rule of Civil Procedure 4(d) in the first instance; Plaintiff will confirm each Foreign Canopy

Defendant's current registered office from the Ontario Business Registry before service. Transmission proceeds under Federal Rule of Civil Procedure 4(h)(2) and 4(f)(1) for the Central-Authority channel and under Rule 4(f)(2)(A) for the Ontario process-server channel. The Convention governs only the manner of transmitting process abroad and does not itself confer personal jurisdiction, which rests on the independent predicates pleaded above. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988); *Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017) (Canada having lodged no objection to Article 10, its channels are available where the forum's law authorizes them).

## III. THE PARTIES

### A. PLAINTIFF

10. Plaintiff Michael Fong is the founder, principal, and controlling authority of Gage Green Group, and receives mail at 4225 Miller Road, Suite 9, #131, Flint, Michigan 48507. Plaintiff has been the senior principal responsible for the continuous commercial use of the GAGE Marks in the ordinary course of trade, documented since 2011 and claimed since 2008. Gage Green Group commenced as a partnership; its bona fide commercial use of the GAGE Marks in commerce, and the goodwill accruing therefrom, are attributable to Plaintiff as senior principal. Upon the July 7, 2022 dissolution of the partnership entity Gage Specialties LLC, all right, title, and interest in and to the GAGE Marks

and their associated goodwill were assigned — *nunc pro tunc* effective the dissolution date — to Fang LLC, and thereafter to Gage Prestige Holdings LLC; those assignments are recorded with the United States Patent and Trademark Office at Reels 8419/0700 and 8419/0719, and the Trademark Trial and Appeal Board recognized Gage Prestige Holdings LLC and Fang LLC as the successor applicants in Opposition No. 91278331. No other person or entity holds any recorded right, title, or interest in the GAGE Marks. Record title to the GAGE Marks is consolidated in Gage Prestige Holdings LLC, and Plaintiff pleads no claim as owner or registrant of any registration (see Paragraphs 32B and 58A). Plaintiff sues in his personal capacity as the individual whose continuous commercial use built the goodwill at issue: from the marks' adoption, Plaintiff personally used and promoted the GAGE Marks and personally conducted and oversaw the offering of goods and services under them, and the injuries pleaded herein are injuries to Plaintiff's own commercial interests in reputation and sales.

## B. CORPORATE DEFENDANTS

11. **TerrAscend Corp.** is a publicly-traded corporation organized under the laws of the Province of Ontario, Canada, listed on the Toronto Stock Exchange (symbol TSND) and the OTCQX market (symbol TSNDF), Central Index Key

0001778129 with the United States Securities and Exchange Commission. TerrAscend Corp. is the ultimate parent of Defendant Gage Growth Corp. since the March 10, 2022 closing of TerrAscend's acquisition of Gage Growth Corp., a transaction announced in 2021 at an approximately $545,000,000 value and valued at approximately $386,000,000 as of the March 2022 closing (Paragraph 41). On information and belief based on TerrAscend's public SEC filings ([Exhibits I], J, and K) and the Michigan Cannabis Regulatory Agency Consent Order in ENF 22-00499 ([Exhibit G], executed on behalf of AEY Capital LLC by Defendant Lynn Gefen in her capacity as Manager while she simultaneously served as Chief Legal Officer of TerrAscend Corp.), Plaintiff alleges that TerrAscend Corp., Gage Growth Corp. (f/k/a Wolverine Partners Corp.), AEY Holdings LLC, and AEY Capital LLC constitute a single business enterprise operated as alter-egos of one another, with common ownership, common officers, common counsel, commingled assets and operations, and shared brand identity; the corporate veils of each are subject to piercing for the misconduct pleaded herein.

12. On information and belief based on Defendants' SEC filings ([Exhibits L-M], [Exhibit I]) and Michigan LARA records, **Gage Growth Corp.** (f/k/a Wolverine Partners Corp.; n/k/a TerrAscend Growth Corp.) is a corporation

organized under the Canada Business Corporations Act, headquartered in Mississauga, Ontario, Canada. It was organized on November 22, 2017 as Wolverine Partners Corp., subsequently changed its name to Gage Growth Corp., and following the TerrAscend acquisition was renamed TerrAscend Growth Corp.; it is a single, continuous legal person throughout. It carries the "Gage Cannabis" line that Radicle Cannabis Holdings Inc. launched in October 2018 and transferred to it, under its then-name Wolverine Partners Corp., on September 16, 2019 (Paragraph 35).

13. "Wolverine Partners Corp." is the former name of Defendant Gage Growth Corp. (Paragraph 12) and is not a separate Defendant; the two names denote a single, continuous legal person. References in this Complaint to "Wolverine Partners Corp." or "Wolverine" denote that Defendant under its former name and describe acts it took under that name, including its acquisition of the "Gage Cannabis" line from Radicle Cannabis Holdings Inc. on September 16, 2019 (Paragraph 35) and the SEC Form 1-A it filed and amended on September 1, September 14, and September 18, 2020 (CIK 0001810254). See [Exhibits L-M].

14. **Radicle Medical Marijuana Inc.** and its affiliate **Radicle Cannabis Holdings Inc.** are Canadian corporations associated with the Reda family;

Radicle Medical Marijuana Inc. created and launched the "Gage Cannabis" line in October 2018, and those rights were transferred to Wolverine Partners Corp. on September 16, 2019. See [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A, CIK 0001810254).

15. **AEY Holdings LLC** is a Michigan limited liability company (LARA No. 802128796) managed by Defendant Lynn Gefen. It participates in the joint venture that, through lead entity AEY Capital LLC, filed the Michigan LARA Certificate of Assumed Name (Document No. 27835986, filed January 15, 2026, effective through December 31, 2031) for the assumed name "Gage Cannabis Company," which Defendant Lynn Gefen executed as authorized agent on behalf of AEY Holdings, LLC; the other participating entities are Thrive Enterprises LLC and Pure Releaf SP Drive, LLC. [Exhibit W-1].

16. **AEY Capital LLC** is a Michigan limited liability company organized under the laws of the State of Michigan that was the subject of the Michigan Cannabis Regulatory Agency Consent Order and Stipulation in Formal Complaint ENF 22-00499 (AUP000138), executed by Lynn Gefen as Manager.

16A. **Pending Michigan receivership of certain Defendants.** On May 6, 2026, the Oakland County Circuit Court (Sixth Judicial Circuit), Case No. 2026-222791-CB, entered an order appointing Charles Bullock of Stevenson &

Bullock, P.L.C. as receiver over certain Michigan entities (the "Michigan Receivership Entities"), which include Defendants AEY Capital LLC and AEY Holdings LLC, on the application of the secured lender's administrative agent following a May 1, 2026 forbearance agreement. See [Exhibit J] (TerrAscend Corp. Form 10-Q filed May 7, 2026, disclosing the receivership and enumerating the Michigan Receivership Entities). To the extent the Michigan Uniform Commercial Real Estate Receivership Act, MCL 554.1024, stays actions against the Michigan Receivership Entities or their property, or MCL 554.1028 conditions suit against the receiver, Plaintiff will seek leave of the appointing court or assert a claim in the receivership as to those Defendants; this action proceeds in all events against the remaining Defendants, whose liability is not affected by the receivership. The receivership does not encumber the traceable acquisition consideration — valued at approximately $386,000,000 at closing (Paragraph 41) — that is the subject of Plaintiff's constructive-trust and Uniform Voidable Transactions Act claims (Count IV), which flowed to the selling Defendants upon the March 10, 2022 closing and is not property of the Michigan receivership estate.

16B. **Spartan Partners Corporation** is a corporation organized under the laws of the State of Michigan whose registered agent for service of process of record

with the Michigan Department of Licensing and Regulatory Affairs is Capitol Corporate Services, Inc., 186 North Main Street, 2nd Floor, Plymouth, Michigan 48170 — the same Michigan resident agent shared across the enterprise's TerrAscend, Spartan, and AEY entity family. Spartan Partners Corporation is named in TerrAscend Corp.'s own public securities filings as one of the Michigan Receivership Entities placed under the Oakland County receivership pleaded in Paragraph 16A. See [Exhibit J] (TerrAscend Corp. Form 10-Q filed May 7, 2026, enumerating the Michigan Receivership Entities, which include "Spartan Partners Corporation"). On information and belief, Spartan Partners Corporation is the Michigan holding corporation that sits atop the enterprise's United States operating entities, holds the operating value of the Gage Michigan retail platform, and constitutes an alter-ego link in the chain of ownership and control running from Wolverine Partners Corp. (n/k/a Defendant Gage Growth Corp.) to the Michigan operating subsidiaries pleaded herein; its corporate veil is subject to piercing for the misconduct pleaded herein. Service will be effected under Federal Rule of Civil Procedure 4(h)(1)(B) upon its Michigan registered agent.

16C. **Spartan Partners Holdings LLC** is a limited liability company organized under the laws of the State of Michigan whose registered agent for service of

process of record with the Michigan Department of Licensing and Regulatory Affairs is Capitol Corporate Services, Inc., 186 North Main Street, 2nd Floor, Plymouth, Michigan 48170. Spartan Partners Holdings, LLC is likewise named in TerrAscend Corp.'s own Form 10-Q filed May 7, 2026 as one of the Michigan Receivership Entities placed under the Oakland County receivership pleaded in Paragraph 16A. See [Exhibit J] (TerrAscend Corp. Form 10-Q filed May 7, 2026, enumerating the Michigan Receivership Entities, which include "Spartan Partners Holdings, LLC"). On information and belief, Spartan Partners Holdings LLC is the intermediate Michigan holding company grouping the enterprise's Michigan operating limited liability companies — including its Michigan services, properties, and licensing subsidiaries and the Mayde United States operations — through which the misappropriated GAGE brand was operated at retail, and is an alter-ego of that Michigan operating tier; its corporate veil is subject to piercing for the misconduct pleaded herein. Service will be effected under Federal Rule of Civil Procedure 4(h)(1)(B) upon its Michigan registered agent.

17. **Cookies Creative Consulting & Promotions, Inc.** (successor by conversion to Cookies Creative Consulting & Promotions LLC) and **Cookies**

**SF LLC** (collectively, "Cookies") are entities associated with Defendant Gilbert Milam, Jr.

18. **Cannabis Legal Group**, also doing business as "The Law Offices of Barton W. Morris, Jr.", is a Michigan law firm with offices in Royal Oak, Michigan, owned by Defendant Barton W. Morris, Jr. Cannabis Legal Group is the registered agent for Terra Mend LLC (Michigan LARA Entity ID 802136141, registered agent Barton W. Morris, Jr., 520 N Main St, Royal Oak, MI 48067). See [Exhibit V] (Michigan LARA records, Terra Mend LLC).

18A. **Canopy Growth Corporation** is a corporation organized under the laws of Canada, with its registered head office at 1 Hershey Drive, Smiths Falls, Ontario K7A 0A8, Central Index Key 0001737927 with the United States Securities and Exchange Commission, and listed on the Nasdaq Global Select Market (symbol CGC) and the Toronto Stock Exchange (symbol WEED). Canopy Growth Corporation is the former employer of Defendant Bruce Linton (Paragraph 20) — its founder and former Chief Executive Officer, who became Executive Chairman and Director of Gage Growth Corp. Through its controlled venture arm Canopy Rivers Inc. (n/k/a Defendant RIV Capital Inc., Paragraph 18B), of which it owned 100% of the Multiple Voting Shares, Canopy Growth Corporation acquired in August 2017 a 23.81% equity stake in Defendant

Radicle Medical Marijuana Inc. — the entity that fourteen months later launched the "Gage Cannabis Co." brand (Paragraphs 33A, 34). Canopy Growth Corporation was a named counterparty, together with Canopy Rivers, to the October 8, 2018 Arrangement Agreement that reorganized Defendant TerrAscend Corp.'s capital and waived the covenants that had restricted TerrAscend from operating in the United States, and following that reorganization Canopy Growth Corporation directly held 19,445,285 TerrAscend Exchangeable Shares. *See* [Exhibit CC] (Cision press release, "In August 2017, Canopy Growth via Canopy Rivers acquired a 23.81 per cent equity stake in Radicle Medical Marijuana," filed as Exhibit A to the Declaration of Ziad Reda in TTAB Opposition No. 91252169, Entry 34 (ESTTA No. 1177929, filed December 10, 2021)); [Exhibit EE] (Canopy Growth Corporation Form 6-K furnished December 3, 2018, Exhibit 99.1, stating that pursuant to the Arrangement, Canopy Growth and Rivers each received 19,445,285 Exchangeable Shares); [Exhibit EE-1] (Canopy Growth Corporation Form 10-K for the fiscal year ended March 31, 2020 (excerpt), stating that Canopy Growth owns 36,468,318 Multiple Voting Shares of Canopy Rivers, representing 100% of the issued and outstanding Multiple Voting Shares); [Exhibit DD] (Schedule 13D on TerrAscend Corp. filed March

17, 2022, describing the TerrAscend Reorganization completed on November 30, 2018).

18B. **RIV Capital Inc.** (f/k/a Canopy Rivers Inc.) is a corporation organized under the laws of the Province of Ontario, Canada; "RIV Capital Inc." is the current name of the former "Canopy Rivers Inc.," the publicly-traded venture arm through which Defendant Canopy Growth Corporation made the investments pleaded herein. As Canopy Rivers Inc., in August 2017 it acquired the 23.81% equity stake in Defendant Radicle Medical Marijuana Inc. that created and first launched the "Gage Cannabis Co." brand (Paragraphs 33A, 34), and it was a named counterparty to the October 8, 2018 Arrangement Agreement reorganizing TerrAscend for United States-market entry (Paragraph 33C). *See* [Exhibit DD] (Schedule 13D on TerrAscend Corp. identifying "RIV Capital Inc. (formerly Canopy Rivers Inc.)"); [Exhibit CC] (23.81% Radicle stake). RIV Capital Inc. maintains its registered head office at 365 Bay Street, Suite 800, Toronto, Ontario M5H 2V1. On December 19, 2024, RIV Capital Inc. was acquired by Cansortium Inc. (which does business as Fluent Corp.) by Ontario plan of arrangement, its shares were delisted, and it ceased to be a reporting issuer in Canada by order of the Ontario Securities Commission dated January 14, 2025; RIV Capital Inc. now operates within the Fluent corporate

group, a fact bearing on the manner of service and the collectability of any judgment. See [Exhibit JJ] (Ontario Securities Commission order dated January 14, 2025, and Fluent Corp. press release dated December 19, 2024, announcing completion of the RIV Capital acquisition).

18C. **Canopy USA, LLC** is a limited liability company formed on October 24, 2022 by Defendant Canopy Growth Corporation to hold Canopy Growth's United States cannabis investments, including its interest in Defendant TerrAscend Corp. Canopy Growth deconsolidated Canopy USA, LLC for financial-reporting purposes effective April 30, 2024, while Canopy USA continued to hold the TerrAscend Exchangeable Shares described below. On December 9, 2022, TerrAscend converted, in exchange for 24,601,467 TerrAscend Exchangeable Shares, aggregate loans plus accrued interest that TerrAscend's own Fiscal Year 2025 Form 10-K states (in thousands) as CAD $125,500, held by Canopy USA, LLC. *See* [Exhibit I] (TerrAscend Corp. Fiscal Year 2025 Form 10-K, SEC EDGAR CIK 0001778129, describing the December 9, 2022 arrangement with Canopy USA, LLC to convert CAD $125,500 (in thousands) in aggregate loans plus accrued interest in exchange for 24,601,467 Exchangeable Shares). On information and belief, Canopy USA, LLC is organized under the laws of a State of the United States; Plaintiff will

confirm its state of organization and registered agent for service of process from the applicable corporate registry before service.

## C. INDIVIDUAL DEFENDANTS

19. **Defendant Jason Wild** is the Executive Chairman and Chairman of the Board of TerrAscend Corp. and controls approximately 27% of TerrAscend's voting capital stock as of March 11, 2026 (and approximately 31% as of March 6, 2025). *See* [Exhibit I] (TerrAscend FY2025 Form 10-K) and SEC Schedule 13D/A filings on TerrAscend, CIK 0001778129. Defendant Wild simultaneously stands on the **creditor** side of TerrAscend: through funds he controls — JW Partners, LP and JW Opportunities Fund, LLC — Defendant Wild is a member of the lender syndicate of TerrAscend's senior-secured FG Loan (a $222,100,000 facility, 12.75% per annum, maturing August 1, 2028), having invested approximately $7,100,000, a relationship TerrAscend's own SEC filings disclose as a related-party transaction and identify as a potential conflict of interest. *See* [Exhibits I] and J (TerrAscend FY2025 Form 10-K and Q1-2026 Form 10-Q, related-party disclosures). Defendant Wild is thus both the controlling equity holder of the debtor and a creditor positioned to benefit from the Michigan receivership described in Paragraph 16A.

20. **Defendant Bruce Linton** is the former Chief Executive Officer of Canopy Growth Corporation (SEC CIK 0001737927) and served as **Executive Chairman and Director of Gage Growth Corp.** Defendant Linton executed the October 12, 2020 Gage-brand License Agreement in his capacity as Executive Chairman and Director of Gage Growth Corp. *See* [Exhibit Z] (October 12, 2020 License Agreement, Gage Growth Corp. signature page bearing "/s/ Bruce Linton — Executive Chairman and Director," produced by Dentons LLP in TTAB Opposition No. 91252169 discovery).

21. **Defendant Lynn Gefen** served as Chief Legal Officer and Corporate Secretary of TerrAscend Corp. from May 23, 2022 until her appointment as Chief People Officer in November 2024, and concurrently served as Manager of AEY Holdings LLC and AEY Capital LLC. TerrAscend publicly announced Defendant Gefen's appointment as Chief Legal Officer and Corporate Secretary effective May 23, 2022. Gefen executed the Michigan CRA Consent Order in ENF 22-00499 in 2023 ([Exhibit G]) in the AEY-Manager capacity while serving as TerrAscend's Chief Legal Officer.

22. **Defendant Fabian Monaco** is the President and Director of Gage Growth Corp. and signed the October 12, 2020 License Agreement on behalf of Gage Growth Corp.

23. **Defendant David Watza** is the **Chief Financial Officer of Gage Growth Corp.** and executed the October 12, 2020 Gage-brand License Agreement in that capacity. *See* [Exhibit Z] (October 12, 2020 License Agreement, Gage Growth Corp. signature page bearing "/s/ David Watza — Chief Financial Officer").

24. **Defendant Michael Hermiz** is a co-founder and director of Wolverine Partners Corp. Hermiz's wholly-owned vehicles received related-party real-estate transfers of $10,150,000 disclosed in Wolverine Partners' SEC Form 1-A. See [Exhibits L-M].

25. **Defendants Rami Reda**, **Youssef Reda**, and **Ziad Reda** are members of the Reda family. Defendant Youssef Reda served as Chief Marketing Officer of the Radicle sellers (Defendant Radicle Medical Marijuana Inc., the Radicle entity that launched the "Gage Cannabis Co." brand, and its affiliate Defendant Radicle Cannabis Holdings Inc.) and simultaneously as a founding board member of Defendant Wolverine Partners Corp. (the buyer of the "Gage Cannabis" brand on September 16, 2019), establishing a non-arms-length insider-transfer relationship as both seller-side and buyer-side principal. On information and belief, and as publicly announced in Radicle Medical Marijuana Inc.'s October 18, 2018 launch of the Gage Cannabis Co. brand,

Defendant Youssef Reda served as Chief Marketing Officer of Radicle Medical Marijuana Inc. (seller-side role); his buyer-side founding board seat at Wolverine Partners Corp. is documented in [Exhibits L-M] (SEC Form 1-A, CIK 0001810254). On information and belief, Defendant Ziad Reda participated in the Reda-family ownership and control of Radicle Cannabis Holdings Inc. and the related-party transactions pleaded in Paragraphs 35–36 and 39; Defendant Ziad Reda personally executed a declaration submitted in support of the enterprise's position in TTAB Opposition No. 91252169 (Entry 34, ESTTA No. 1177929, filed December 10, 2021), attaching as its Exhibit A the press release documenting Canopy's August 2017 funding of the brand-source entity. *See* [Exhibit CC].

26. **Defendant Ziad Ghanem** is the Chief Executive Officer and President of TerrAscend Corp. *See* [Exhibit I] (TerrAscend FY2025 Form 10-K, SEC EDGAR CIK 0001778129). On information and belief, as the enterprise's current Chief Executive Officer and President, Defendant Ghanem directs and ratifies TerrAscend's continued conduct of the enterprise's affairs — including the enterprise's continued occupation of Plaintiff's mark-space and the concealment pleaded in Paragraphs 44–45C — and thereby knowingly agreed to the furtherance of the enterprise's pattern of racketeering activity within the

meaning of 18 U.S.C. § 1962(d); he is named in the Count III conspiracy (Paragraph 73), not the Count II substantive claim.

27. **Defendant Gilbert Milam, Jr.** (publicly known as "Berner") is the founder of Defendants Cookies Creative Consulting & Promotions, Inc. (successor by conversion to Cookies Creative Consulting & Promotions LLC) and Cookies SF LLC. Cookies has acted as the principal Michigan licensing partner of the TerrAscend Gage retail platform. Defendant Milam personally promoted and endorsed the GAGE-branded Michigan operation: he headlined a "GAGE PRESENTS BERNER" event at the Garden Theater in Detroit on October 20, 2019, appeared inside Gage Cannabis retail locations amid GAGE-branded packaging, publicly endorsed the operation as "the EXCLUSIVE providers for the REAL @cookiessf in MICHIGAN," and thanked "my Michigan team at Gage." [Exhibit QQ].

28. **Defendant Jennifer Lynn Domingue** held herself out to Plaintiff and to the public as an attorney. On the September 20, 2021 City of Owosso marihuana-license amendment application that she completed on behalf of Defendant AEY Holdings LLC, she stated her affiliation with that entity as "Attorney" and gave her contact address as legal@gageusa.com and her telephone number as (734) 770-9529. *See* [Exhibit AA]. During her association with Defendant Cannabis

Legal Group, Domingue provided legal consultation to Plaintiff concerning Plaintiff's rights in the GAGE Marks dispute, for which Plaintiff paid Cannabis Legal Group. Thereafter, and within the same GAGE Marks dispute, Domingue acted adversely to Plaintiff — including by completing the September 20, 2021 Owosso license application on behalf of AEY Holdings LLC, the enterprise's Michigan licensee then operating under the assumed name "Gage Cannabis Company," as "Attorney" and using the enterprise email address legal@gageusa.com — without disclosure to, or written informed consent from, Plaintiff. Section XI pleads Domingue's acceptance of Plaintiff's confidences and compensation while acting as counsel, and her subsequent adverse conduct. Domingue — who now practices under the name Jennifer Lynn Smith as Vice President of Legal at 365 Retail Markets — is a verified active member of the State Bar of Michigan in good standing, as reflected in the State Bar of Michigan's public member-directory record for "Jennifer Lynn Smith." *See* [Exhibit BB] (State Bar of Michigan member-directory record, retrieved August 7, 2026). Plaintiff pleads no bar-registration number.

29. **Defendant Barton W. Morris, Jr.** is a Michigan-licensed attorney (Michigan Bar No. P54701), owner of Defendant Cannabis Legal Group, and registered agent for Terra Mend LLC (Michigan LARA Entity ID 802136141),

an entity within the TerrAscend-Gage enterprise. *See* [Exhibit W-2] (Michigan State Bar Member Directory listing for P54701, michbar.org); [Exhibit V] (Michigan LARA Corporate Records, Entity ID 802136141, Terra Mend LLC, registered agent Barton W. Morris, Jr., 520 N Main St, Royal Oak, MI 48067).

29A. **Defendant Michael Finos** is, and at the times relevant hereto was, the President (USA), Executive Vice President, and a Director of Gage Growth Corp. Defendant Finos executed the October 12, 2020 Gage-brand License Agreement in those capacities. *See* [Exhibit Z] (October 12, 2020 License Agreement, Gage Growth Corp. signature page bearing "/s/ Michael Finos — President (USA), EVP and Director"). As the United States President of Gage Growth Corp., Defendant Finos directed and participated in the enterprise's United States operations, including the misappropriation and monetization of the GAGE Marks pleaded herein.

30. **Does 1–10** are persons or entities whose identities Plaintiff will substitute upon ascertaining them, including without limitation other directors, officers, agents, attorneys, and beneficial owners of the foregoing Defendants who participated in the predicate acts pleaded herein.

## IV. PLAINTIFF'S MARKS AND PRIOR USE

31. Plaintiff claims to be the senior user of the GAGE Marks in commerce, with continuous commercial use documented since 2009 and claimed earlier. Plaintiff's commercial-use record is independently verifiable through the following primary sources:

a. **The TTAB record.** Plaintiff's testimony and documentary evidence of record in TTAB Opposition No. 91278331 and TTAB Opposition No. 91252169 assert commercial use of the GAGE Marks across cannabis genetics, breeding, distribution, education, and publication channels, with first use claimed as early as 2008–2009. This includes Plaintiff's sworn declarations of record. (Plaintiff acknowledges that the Board, on the registration-opposition record before it, found priority of common-law use not established by a preponderance; Plaintiff asserts marketplace-use priority de novo here on the fuller record pleaded below.) See [Exhibit F-1] (Sworn Declaration of Michael Fong, TTAB Opp. No. 91252169, 150 pp as filed) and [Exhibit F-2] (Sworn Declaration of Michael Fong, TTAB Opp. No. 91278331, 161 pp as filed); see also [Exhibits F-3 through F-9] (Plaintiff's September 28, 2023 declaration in support of motion to strike, Plaintiff's supplemental declaration, and the continuous-use trial exhibits of record filed with Plaintiff's TTAB declarations). (Plaintiff does not rely on the TTAB's registration-opposition disposition as a finding of

priority; priority is established in this Court de novo on the marketplace-use record pleaded herein.) See also [Exhibits A-D] (TTABVUE 91278331 and 91252169). This 2008–2009 first-use claim is documented by a contemporaneous September 13, 2009 message received at the gage@hushmail.com account from a prospective purchaser (Central Valley Collective) responding to Plaintiff's public budtrader.com classified advertisement offering the "Grape Stomper" cannabis strain; by a cannabis-seed pack insert ("Motarebel Genetics — Green Manalishi") marked "Distributed by Gage Green" and dated "12 seeds April 2010," and a companion "Knight's Templar" seed release marked "Gage Green Distribution" in Spring 2010 — physical specimens of the GAGE GREEN mark used in commerce on the goods themselves (cannabis seeds) in 2010; and by a third-party grow journal dated March 16, 2011 identifying "Gage Green Genetics" and its breeder "Keyplay" — the same GAGE genetics line reflected in Plaintiff's 2011 arm's-length sales (subparagraph (d)). Together these evidence continuous commercial use of the GAGE GREEN mark to distribute cannabis seeds as early as September 2009 and on the goods themselves by April 2010, predating the enterprise's October 2018 adoption by more than eight years. See [Exhibit TT].

b. **The Internet Archive.** The Wayback Machine preserves verifiable status-200 captures of gagegreen.org as a commercial cannabis-genetics website beginning April 3, 2011, with a fully operational e-commerce and content presentation captured July 9, 2011 (the page title read "Gage Green Genetics," with the masthead "Serving the finest cannabis for connoisseurs in the medical community"), continuous through 2013 and beyond.

c. **Plaintiff's federal registrations and applications.** Serial No. 90324487 matured into Registration No. 8,268,743 (GAGE GREEN GROUP, Int'l Class 025), issued May 26, 2026; Serial No. 88527221 matured into Registration No. 7,402,223 (GGG, hemp-derived-seed goods), registered May 28, 2024. Serial Nos. 90746550 and 97251818 remain pending applications. Each survived the TTAB judgment in Opposition No. 91278331 (see ¶ 3; [Exhibit A]). Title to these registrations is consolidated in Gage Prestige Holdings LLC through the assignments recorded with the USPTO Assignment Recordation Branch at Reels 8419/0700 and 8419/0719; the USPTO's TSDR owner-display field has not yet been conformed to those recorded assignments (the USPTO's own prosecution history notes "ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY"), and a no-fee request under 15 U.S.C. § 1057(g) to conform the display to the recorded chain of title was filed August 7, 2026 and

is pending. Plaintiff pleads ownership from the recorded assignments, which control over the display field.

d. **Dated commercial sales in the ordinary course of trade (2011–2019).** Plaintiff's continuous commercial use of the GAGE Marks is further documented by dated invoices and purchase orders for goods sold and shipped under the "Gage Green" / GAGE GREEN GROUP name in the ordinary course of trade, spanning 2011 through 2019 — and including federally-lawful Class 025 apparel documented by neutral third-party vendor records dated March and April 2014 — (See [Exhibits N-2, N-3, N-4, N-5, and N-6], authenticated by the concurrently-filed Declaration of Michael Fong and, as to the third-party vendor records, by their custodians under Fed. R. Evid. 902(11)) without material interruption. Each is a record of Plaintiff's own commercial activity, authenticated by the concurrently-filed Declaration of Michael Fong under Fed. R. Evid. 901(b)(1):

i. **February 8, 2011 — arm's-length sale to Harborside Dispensary, Oakland, California.** "Gage Green" Invoice No. 0127-5, "Invoice Date: Feb 8, 2011," issued from "Gage Green … www.gagegreen.org … admin@gagegreen.org," billed and shipped to "Harborside Dispensary Oakland, 1840 Embarcadero, Oakland, CA 94606," on "Net 30 Days" terms, for GAGE-

branded genetics including "Lemon Stomper," "Pepe Le Chem," "Pepe Le Dank," "Cindy La Pew," "L.A. Haze," "Flight 813," "Morning Flight," "Blackberry Pie (5 Pack)," and "Mendo Montage," at a "Total Invoice Amount" of "3,200.00," paid in full ("Payment/Credit Applied 3,200.00; TOTAL 0.00"). See [Exhibit N-2].

ii. **August 17, 2011 — arm's-length sale to Attitude Seedbank.** "Gage Green" Invoice No. 0127-22, "Invoice Date: Aug 17, 2011," issued from "Gage Green … admin@gagegreen.org … www.gagegreen.org," billed and shipped to "Attitude Seedbank" on "Net 30 Days" terms, for GAGE-branded genetics including "Dumbo (Grape Stomper BX)" (quantity "40.00" at "50.00," extended "2,000.00"), "Lemon Stomper," "Pepe Le Chem," "Cindy La Pew," and "L.A. Haze," at a "Subtotal" of "3,724.00," "Shipping & Handling" of "30.00," and a "TOTAL" of "3,754.00." See [Exhibit N-3].

iii. **March 11, 2014 — GAGE-branded commerce in Michigan.** Two contemporaneous "Gage Green" purchase orders establish GAGE-branded commerce in Michigan years before any Defendant's Michigan use: (A) Purchase Order No. 6, dated "3-11-14," shipping GAGE GREEN genetics — including "Aspirare," "Bright Floral Lift," "D Cure," "Daybreaker," "Kaleidoscope," and "Grapestomper OG" — under the "Gage Green" name to

an address in Oxford, Oakland County, Michigan ("Gage Green Sales … 675 vivian ln oxford mi 48371"), at a "Current order total" of "$2028.75"; and (B) Purchase Order No. 7, an arm's-length sale shipping GAGE GREEN genetics — including "5K Puff," "Blessings OG," "Grateful Breath," "Mindscape," "Pepe Le Dank," and "Starlet Kush" — to "Jc3 Jackson Michigan … 1620 E Michigan Ave … Jackson, MI 49202 … info@jacksoncompassionclub.com," at a "SUBTOTAL" of "$3,303.75" and "TOTAL due" of "$2220.00." Purchase Order No. 7 bears no date on its face; on information and belief it is contemporaneous with Purchase Order No. 6, with which it is consecutively numbered and which is dated March 11, 2014. See [Exhibit N-5]. These Michigan transactions are pleaded further in Paragraph 8.

iv. **March–April 2014 — lawful Class 025 apparel commerce.** Two contemporaneous third-party vendor records document Plaintiff's use of the GAGE Marks on clothing — goods lawful under federal law at all times — years before any Defendant's use of the GAGE brand: (A) **Satori Movement, Inc. Invoice No. 27342**, dated and stamped paid March 28, 2014, "BILL TO: Gage Green Group … Oakland, CA," for 120 blank hemp/organic-cotton short-sleeve t-shirts (including four in purple), shipped by FedEx Ground (Tracking No. 977696326393) to "Forward Printing … Oakland, CA," at a "Total" of

"$1,007.07" and a "Balance Due" of "$0.00"; and (B) **Forward Printing, Inc. Invoice No. 6906**, dated April 16, 2014, "CLIENT: Gage Green," for a 320-piece, two-design garment print run — 200 heavy cotton t-shirts bearing the "Always Runnin' Dank" five-color chest print and 119 customer-supplied garments bearing the metallic "GGG Cross" chest print — at a "total" of "$1,897.40," paid in full by two PayPal transactions (Transaction ID 46P58222HM9907811, April 7, 2014, $949.58; Transaction ID 44578101SE1992011, April 16, 2014, $947.82). These are the records of neutral third-party vendors, self-authenticating through each vendor's records custodian under Fed. R. Evid. 902(11) and corroborated by the FedEx and PayPal transaction records referenced on their face; the purple hemp blanks Satori supplied and the metallic "GGG Cross" Forward Printing printed on customer-supplied garments are the same garments depicted in Plaintiff's contemporaneous 2014 use, authenticating that use by distinctive characteristics under Fed. R. Evid. 901(b)(4). Together they corroborate Plaintiff's contemporaneous commercial apparel operation under the Gage Green Group house — including Forward Printing's April 2014 affixation of the "GGG Cross" (Gage Green Group) mark to garments — on International Class 025 goods lawful under federal law, more than four years before the enterprise's

October 2018 Michigan brand launch, and corroborating the November 13, 2012 first-use-in-commerce date claimed in Registration No. 8,268,743. See [Exhibit N-4].

v. **2019 — arm's-length wholesale sales of GAGE GREEN GROUP genetics.** Plaintiff's GAGE GREEN GROUP ("GGG") continued the same commercial use through dated 2019 wholesale orders: a "WHOLESALE ORDER" for "Great Lakes Genetics," "DATE: January 8, 2019," with a stated "TOTAL" of "4444"; a "WHOLESALE ORDER" for "Great Lakes Genetics," "DATE: April 12, 2019," with a stated "TOTAL" of "10731"; a "GGG WHOLESALE ORDER" for "GLG," "DATE: September 12, 2019," with a stated "TOTAL" of "13212"; and a 2019 GGG wholesale order workbook identifying its buyer on its face as "GLG," pricing genetics by "HALF PK COST" and "FULL PK COST" with per-sheet "TOTAL" figures of "8030" and "9855." Each order lists GAGE GREEN GROUP genetics crosses — including "Grape Stomper OG," "Grateful Breath F2," "Out of Body Experience," "Triumphant," and "Synchronicity." See [Exhibit N-6].

These dated transactions — California (2011), Michigan (2014), and interstate wholesale (2019) — evidence bona fide, continuous commercial use of the GAGE Marks in the ordinary course of trade sufficient to establish a protectable

interest and priority even without extensive market penetration. *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir. 1998). Plaintiff's continuous-use record independently includes goods lawful under federal law at all relevant times — the International Class 025 apparel documented by the March and April 2014 third-party vendor records pleaded in Paragraph 31(d)(iv) ([Exhibit N-4]) — and any "unlawful use" defense directed at the cannabis-related components of this use is addressed and foreclosed in Paragraph 58B.

32. Plaintiff claims a commercial-use priority date senior to the first documented use of any Defendant. Defendant Radicle Cannabis Holdings Inc. launched its "Gage Cannabis" brand in October 2018 — years after Plaintiff's documented first commercial use (2011) and Plaintiff's claimed first use (2008–2009). Defendant Cookies' first archived web presence is dated March 7, 2013, more than twenty-three months after Plaintiff's earliest archived commercial presence at gagegreen.org (April 3, 2011). See [Exhibit P] (Internet Archive Wayback Machine CDX records for gagegreen.org and cookiessf.com).

32A. Plaintiff candidly discloses that in TTAB Opposition No. 91252169 the Board dismissed Plaintiff's predecessor-opposers' Section 2(d) opposition on the ground that priority of common-law use was not established by a preponderance

on the registration-opposition record, and expressly declined to reach likelihood of confusion. That disposition does not foreclose the claims pleaded here, for two independent reasons. First, issue preclusion under Restatement (Second) of Judgments § 27 reaches only the issue actually litigated and necessarily decided: the Board adjudicated priority as of the constructive-use filing date on the specific registration classes then at issue, on the limited opposition record; it did not adjudicate — and could not, in a registration opposition — Plaintiff's right to use the GAGE Marks in the retail-cannabis marketplace across the approximately twenty (20) Michigan stores, the usages and fuller evidentiary record pleaded in Paragraphs 31–32, 36, and 50–51. Second, the rights at issue in this Court — the common-law **right to use** the marks in commerce, and Plaintiff's own commercial-interest injuries under Section 43(a) and RICO — are distinct from the right to register that the TTAB adjudicated, and Plaintiff asserts them without claiming personal ownership of the record title consolidated in Gage Prestige Holdings LLC (Paragraphs 10, 32B). *See FirstHealth of the Carolinas, Inc. v. CareFirst of Maryland, Inc.*, 479 F.3d 825 (Fed. Cir. 2007) (the right to register and the right to use are distinct); Michigan common-law trademark rights, MCL 429.44. The Board's registration-priority disposition therefore neither adjudicated nor precludes Plaintiff's Michigan

common-law right to use, or the Lanham Act § 43(a), RICO, and voidable-transfer claims pleaded here. Controlling authority confirms that limitation rather than displacing it: a TTAB determination is entitled to issue-preclusive effect in later district-court litigation only "[s]o long as the other ordinary elements of issue preclusion are met, when the usages adjudicated by the TTAB are materially the same as those before the district court." *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 160 (2015). Neither condition is met here. The retail-marketplace usages across the approximately twenty (20) Michigan stores pleaded in Paragraphs 31–32, 36, and 50–51 are not the constructive-use-date registration usages the Board adjudicated; and whereas the tribunal in *B&B Hardware* had actually decided likelihood of confusion, the Board here expressly declined to reach that issue, leaving no confusion determination capable of preclusive effect.

32B. The Board's ownership findings are equally consistent with the claims pleaded here. The Board found that Gage Prestige Holdings LLC is the owner of the GAGE common-law marks and the associated applications, and that the assignments consolidating that title withstood attack. Plaintiff does not dispute — and does not sue upon — that record title: no claim is pleaded under 15 U.S.C. § 1114, and no relief is sought in the capacity of owner or registrant.

Plaintiff's Section 43(a) claim rests instead on the two showings the Supreme Court has held that statute requires — an injury within the statute's zone of interests, proximately caused by the violation: "to come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales," and "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–133 (2014). Although the quoted formulation arose under the false-advertising prong of § 1125(a)(1)(B), Lexmark's zone-of-interests and proximate-cause framework governs standing under § 1125(a) generally, including the false-designation-of-origin prong of § 1125(a)(1)(A) under which Count I is pleaded; Plaintiff's injury — the diversion of consumer recognition and trade from Plaintiff's own commercial use of the GAGE Marks — satisfies that framework in the false-designation context no less than in the false-advertising one. Plaintiff pleads precisely those injuries: the diversion of consumer recognition, trade, and brand-equity value from Plaintiff's own commercial activity under the GAGE Marks (Paragraphs 31–32, 50–51, 70).

Standing under Section 43(a) does not turn on registration or record title — the statute protects unregistered marks and reaches injuries to those who use them in commerce. The nunc-pro-tunc consolidation of the registered marks' title, and of the goodwill symbolized by those registrations, in Gage Prestige Holdings LLC (Paragraph 10) neither assigned away nor could assign away Plaintiff's own personal commercial interest — his reputation as the senior principal and originator of the GAGE house of marks and his own continuing commercial activity — and it is that personal interest, not the assigned record title, on which Plaintiff sues and which Section 43(a)'s zone of interests protects irrespective of mark ownership. Accordingly, the injuries pleaded in Paragraphs 69E–70 are injuries to Plaintiff's own commercial interest in reputation and sales and to Plaintiff's own business and property — cognizable under *Lexmark* and under 18 U.S.C. § 1964(c) — and are distinct from any diminution in the record title held by Gage Prestige Holdings LLC, which Plaintiff does not assert.

## V. OPERATIVE FACTS

### A. THE TERRASCEND-GAGE ENTERPRISE

33. Beginning no later than November 22, 2017, the Defendants formed and operated a continuous enterprise whose common purpose was the misappropriation, monetization, and concealment of the GAGE Marks and the

goodwill those marks had accrued through Plaintiff's continuous commercial use. The enterprise was funded at its origin by Defendant Canopy Growth Corporation, which — through its controlled venture arm Canopy Rivers Inc. (n/k/a Defendant RIV Capital Inc.) — acquired in August 2017 a 23.81% equity stake in the Radicle entity that created and launched the "Gage Cannabis Co." brand (Paragraph 33A), and was thereafter conducted through a chain of related-party transfers from Radicle Cannabis Holdings Inc. (Reda-family seller) to Wolverine Partners Corp. (Hermiz / Reda-family buyer) to Gage Growth Corp. (the renamed Wolverine vehicle) to TerrAscend Corp. (the public-market acquirer, in which Canopy Growth Corporation and, later, Defendant Canopy USA, LLC held equity interests), with Cookies (Milam) acting as the principal Michigan retail licensing partner. *See* [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A, CIK 0001810254); [Exhibit H] (TerrAscend Form 8-K filed 2022-03-14); and [Exhibits CC, DD, EE, I].

33A. **Canopy's funding of the brand's origin.** In August 2017 — fourteen months before the "Gage Cannabis Co." brand was launched — Defendant Canopy Growth Corporation, acting through its controlled venture arm Canopy Rivers Inc. (n/k/a Defendant RIV Capital Inc.), acquired a 23.81% equity stake in Defendant Radicle Medical Marijuana Inc., the entity that created and first

launched that brand. This fact appears in Defendants' own record: the press release announcing the launch, filed by the Reda-family declarant Ziad Reda as Exhibit A to his declaration in TTAB Opposition No. 91252169, states that "[i]n August 2017, Canopy Growth via Canopy Rivers acquired a 23.81 per cent equity stake in Radicle Medical Marijuana." *See* [Exhibit CC]. Canopy Growth Corporation controlled Canopy Rivers through ownership of 100% of its issued and outstanding Multiple Voting Shares. *See* [Exhibit EE-1] (Canopy Growth Corporation Form 10-K, fiscal year ended March 31, 2020 (excerpt)).

33B. **The Canopy-to-Gage principal bridge.** The same enterprise that Canopy's venture arm had seeded was placed under the chairmanship of a Canopy principal: former Canopy Growth Corporation founder and Chief Executive Officer Bruce Linton — who co-founded Canopy Rivers in 2017 — was appointed Executive Chairman of the corporation that acquired and monetized the brand, and executed the October 12, 2020 Gage-brand License Agreement in that capacity (Paragraphs 20, 40). *See* [Exhibits L-M] (Wolverine / Gage Growth SEC Form 1-A, reciting that the corporation appointed former Canopy Growth Corporation CEO Bruce Linton as Executive Chairman and that Bruce co-founded Canopy Rivers in 2017). On information and belief, at the time he assumed that chairmanship Defendant Linton concurrently held

personal investments in cannabis-genetics ventures that competed with Plaintiff's Gage Green Group genetics business — including DNA Genetics and OG DNA — giving him direct knowledge of the cannabis-genetics market in which the GAGE Marks had accrued goodwill. This is established by the Defendants' own SEC filing: the Wolverine / Gage Growth offering circular's director biography for Defendant Linton states that he co-founded Canopy Rivers in 2017 and is "an active investor in OG DNA Genetics Inc." See [Exhibits L-M] (Wolverine Partners Corp. Form 1-A/A, CIK 0001810254, Linton director biography). OG DNA Genetics Inc. is a cannabis-genetics seed house (founded in Amsterdam in 2004 by Don Morris and Aaron Yarkoni) operating in Plaintiff's competitive lane, and Defendant Linton's investment in it was separately announced in OG DNA Genetics Inc.'s own December 11, 2019 press release. See [Exhibit HH] (OG DNA Genetics Inc. press release, December 11, 2019). Canopy Growth Corporation's own website (canopygrowth.com) featured DNA Genetics as one of its named brands continuously from 2019 through 2022, reflecting a formal Canopy Growth–DNA Genetics partnership first entered in 2015 and extended through 2024. See [Exhibit II] (Internet Archive Wayback Machine status-200 captures of canopygrowth.com/brands dated September 17, 2019, September 25, 2020, and

February 2022, together with Canopy Growth's news release "Canopy Growth and DNA Genetics Extend and Expand Relationship").

33C. **The structural tie into the public-market acquirer.** Defendant Canopy Growth Corporation and Canopy Rivers Inc. (n/k/a Defendant RIV Capital Inc.) were named counterparties, together with the Jason Wild-controlled funds, to the October 8, 2018 Arrangement Agreement that reorganized Defendant TerrAscend Corp.'s capital and obtained waivers of the covenants that had restricted TerrAscend from operating in the United States (the "TerrAscend Reorganization," completed November 30, 2018), and following that reorganization Canopy Growth and Canopy Rivers each held 19,445,285 TerrAscend Exchangeable Shares. The Arrangement Agreement's covenant-waiver provision (§ 4.3) conditioned the Canopy entities' agreement not to enforce their contractual restrictions upon TerrAscend not deriving revenue from, or acquiring a business engaged in, marijuana in the United States — confirming that the reorganization to which the Canopy entities were parties was directed at enabling the very United States cannabis operations through which the GAGE brand was later misappropriated in Michigan. That Arrangement Agreement remained a listed material contract in TerrAscend's Fiscal Year 2025 Form 10-K — inside the acquirer's capital structure across the

entire pendency of the TTAB proceedings. *See* [Exhibit DD] (Schedule 13D on TerrAscend, filed March 17, 2022); [Exhibit EE] (Canopy Growth Corporation Form 6-K furnished December 3, 2018, Exhibit 99.1); [Exhibit I] (TerrAscend Fiscal Year 2025 Form 10-K, exhibit index listing the "Arrangement Agreement, dated October 8, 2018, by and among TerrAscend Corp., Canopy Growth Corporation, Canopy Rivers Corporation, JW Opportunities Master Fund, Ltd., JW Partners, LP and Pharmaceutical Opportunities Fund, LP").

33D. **Canopy's continuing interest in the enterprise.** Canopy Growth's interest in the enterprise that monetized the GAGE Marks did not end with the reorganization: on December 9, 2022, TerrAscend converted, in exchange for 24,601,467 TerrAscend Exchangeable Shares, aggregate loans plus accrued interest stated in TerrAscend's Fiscal Year 2025 Form 10-K (in thousands) as CAD $125,500, held by Canopy Growth's United States holding company, Defendant Canopy USA, LLC. *See* [Exhibit I].

33E. **Interlocking directorate.** The enterprise's coordination across the Canopy-venture-arm, seller, and buyer nodes is documented by a common director. On information and belief, Richard Mavrinac sat simultaneously on the boards of RIV Capital Inc. (f/k/a Canopy Rivers Inc.), Defendant Gage Growth Corp. (the seller), and Defendant TerrAscend Corp. (the buyer) during

the acquisition, and chaired TerrAscend's Audit Committee. Canopy Rivers Inc.'s own May 31, 2018 announcement named Richard Mavrinac as one of its independent directors, and TerrAscend's registration statement states that Richard Mavrinac is a director of both TerrAscend and Gage and values his personal interest in the transaction at $345,611. *See* [Exhibit GG] (Canopy Rivers Inc. announcement of May 31, 2018 naming Richard Mavrinac an independent director); [Exhibit FF] (TerrAscend Form 10 registration statement (excerpt)). That interlock gave the enterprise board-level visibility spanning the funding, sale, and acquisition of the misappropriated brand. Mr. Mavrinac is pleaded here as an enterprise-coordination and knowledge fact and is not named as a Defendant, and requires no service. (TerrAscend's related-party disclosures separately state the exchange value of the 40,213 Gage subordinate-voting shares and 6,683 restricted share units for which Mr. Mavrinac received the interest valued above at $345,611.)

## B. THE SEPTEMBER 16, 2019 INSIDER TRANSFER

34. In October 2018, Defendant Radicle Medical Marijuana Inc., controlled by the Reda family, launched the "Gage Cannabis Co." brand. See [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A, CIK 0001810254, Section VII).

35. On September 16, 2019, Wolverine Partners Corp. acquired the "Gage Cannabis" trademark rights and goodwill from Radicle Cannabis Holdings Inc. for CAD $250,000 cash, plus 250,000 contingent Subordinate Voting Shares payable upon successful registration of the "Gage" trademark in Canada and the United States. See [Exhibits L-M] (SEC Form 1-A, Wolverine Partners Corp., CIK 0001810254, Section VII).

36. The September 16, 2019 transaction was a non-arms-length insider transfer. Defendant Youssef Reda served as Chief Marketing Officer of the Radicle sellers and simultaneously as a founding board member of Wolverine Partners Corp. (the buyer). See [Exhibits L-M] (Youssef Reda's buyer-side board seat); Radicle's October 18, 2018 public launch announcement identified him as Chief Marketing Officer of the seller. The CAD $250,000 purchase price was facially below-market for a brand with continuous commercial use documented since 2011 (and claimed since 2008) across multiple International Classification classes and the substantive distinctiveness reflected in the TTAB record. See [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A) and [Exhibits A-D] (TTABVUE 91278331 and 91252169). The below-market character of that price is independently confirmed by a bona-fide, arm's-length purchase offer Plaintiff had received months earlier: on March 21, 2019, Kevin Pattah offered

Plaintiff $10,000,000 to purchase the Gage Green brand ("I'll give u 10 million."), an offer Plaintiff declined as below the brand's value ("that's not even close to what we are worth"). See [Exhibit UU]. The enterprise thus acquired for CAD $250,000, in September 2019, a brand that a disinterested third party had valued at ten million dollars only approximately six months earlier — a roughly fortyfold disparity probative both of the brand's commercial value and goodwill and of the non-arms-length, below-value character of the insider transfer.

36A. **The acquisition instrument itself catalogues contested and "potential" claims to the very GAGE mark it purported to convey — direct evidence of knowledge and willfulness.** The September 16, 2019 transfer was effected by a written Asset Purchase Agreement dated as of September 16, 2019 among Wolverine Partners Corp. (as "Purchaser"), Radicle Cannabis Holdings Inc. (as "Vendor"), and Gage Co. Inc., filed as material-contract Exhibit 1A-6A to the Wolverine Partners Corp. SEC Form 1-A offering statement (SEC EDGAR CIK 0001810254). *See* [Exhibit KK] (Asset Purchase Agreement, September 16, 2019). That instrument is not silent about competing claims to the "GAGE" mark — it enumerates them. In Section 3.2(d), the Vendor and Gage Co warranted only that, "to the best of its knowledge," and expressly "other than" a

list of adversaries they there named — including "a potential opposition proceeding with respect to a potential opposition by Gage Specialties LLC in relation to the GAGE trademark, U.S. serial no. 87/695,693," "the Caipco LLC US application no. 87/806,329 for the GAGE mark," and "the Gage Cannabis Company Final Certificate of Registration through the Massachusetts Cannabis Control Commission (on May 31, 2019)" — "there is no claim or threatened or potential claim that the Gage Brand or use of the Gage Brand infringes, violates, or breaches the rights of any other person or entity." [Exhibit KK] § 3.2(d). The carve-out is the admission: a party that must except named "potential" oppositions and a competing "GAGE" application from its own non-infringement warranty knew, at the moment of acquisition, that title to the "GAGE" mark was contested. Section 3.2(c) is to the same effect, warranting non-infringement only "to the best of its knowledge and other than as set out below, the Gage Brand does not infringe or misappropriate any intellectual property right of any other person or entity." *Id.* § 3.2(c).

36B. **The enterprise simultaneously armed itself to litigate for the contested mark and pre-committed to defend oppositions — conduct incompatible with a good-faith belief in clean title.** In the same instrument, the assignment conveyed to the Purchaser not only the brand but "the right to oppose any

application to register any trademark which is or may be confusingly similar to the Gage Brand" ([Exhibit KK] § 3.1(e)) and "the right to take action and recover in respect of any and all causes of action and rights to sue for past infringement or similar violations of associated intellectual property rights in the Gage Brand" ([Exhibit KK] § 3.1(d)); the Purchaser covenanted that it "shall (or shall instruct its counsel to) take all reasonable steps involved in registering the trademarks 'GAGE' in Canada and the U.S., namely Canadian application no. 1868389 and U.S. serial nos. 88309277 and 87695693, including by defending any opposition or court action regarding such marks" (§ 6.2(f)); and the parties agreed that "[t]he Purchaser shall have the first right to initiate and to prosecute legal proceedings against third parties for infringement of the Intellectual Property Rights in the Gage Brand" (§ 9.5). *See* [Exhibit KK] §§ 3.1(d)-(e), 6.2(f), 9.5. An acquirer that contracts, in advance, to defend "any opposition or court action" over the "GAGE" serials, and that equips itself with the "first right" to sue infringers and the right to oppose confusingly similar marks, does not act in the good-faith belief that the mark is unencumbered; it acquires with knowledge of, and preparation for, the contest.

36C. **Materiality to the claims pleaded.** These admissions in Defendants' own acquisition instrument bear directly on four issues in this action. First, they

establish that the misappropriation was knowing and willful for purposes of 15 U.S.C. § 1117(a)-(b), reinforcing the willfulness pleaded in Paragraph 45D: the enterprise's own contract documents knowledge, at inception, that "potential" claims to the "GAGE" mark existed and that the mark would have to be defended against "opposition or court action." Second, they reinforce the unclean-hands foundation pleaded in Paragraph 58B: the enterprise cannot invoke the equity of clean title while its own agreement shows it warranted that "there is no claim ... that the Gage Brand ... infringes" only by carving out the very "potential" claims it simultaneously acknowledged. Third, they supply the seventh *Frisch's* factor pleaded in Paragraph 59A — the defendant's intent in selecting and using the mark — because a purchaser who contracts to defend oppositions and to prosecute infringers over a contested "GAGE" serial adopts that mark with knowledge of competing rights, not in innocence of them. Fourth, they corroborate the specific-intent and scienter elements of the RICO claims in Counts II and III (Paragraphs 66-74): the enterprise formed, funded, and monetized the GAGE Misappropriation Enterprise with contemporaneous documentary knowledge that title to the "GAGE" mark was contested. Plaintiff does not allege that the Asset Purchase Agreement names Plaintiff or admits knowledge of Plaintiff's senior use; the instrument's enumerated exceptions

concern Gage Specialties LLC and the other third parties it lists, and the enterprise's knowledge of Plaintiff's senior claim is separately pleaded (Paragraphs 40, 45D). The narrower point established within the four corners of Defendants' own contract is sufficient here: the enterprise acquired the "GAGE" mark while warranting clean title and, in the same breath, excepting from that warranty the contested and "potential" claims it knew to exist.

36D. **The buyer's director stood on both sides of the September 16, 2019 sale, and the buyer financed the seller — further evidence that the transfer was not arm's-length.** The non-arm's-length character of the September 16, 2019 transfer is confirmed by the enterprise's own disclosures. First, Defendant Michael Hermiz — the co-founder and a director of the buyer, Wolverine Partners Corp. — simultaneously held an ownership interest in the seller, Radicle. In Gage Growth Corp.'s own CSE Form 2A Listing Statement, under the heading "Conflicts of Interest," the enterprise disclosed that "Mr. Hermiz holds an approximately 19.4% ownership interest in Radicle on a fully diluted basis," and that "Radicle's shareholder is Michael Hermiz, co-founder and a director of the Corporation." *See* [Exhibit NN] (Gage Growth Corp. CSE Form 2A Listing Statement, "Conflicts of Interest" chart). A buyer-side director who owned approximately 19.4% of the seller on the date the seller sold the "Gage"

brand to his own company for CAD $250,000 is a dual-side insider, and the enterprise's own listing statement flags that seller-side stake as his conflict of interest. Second, the same director held a 28.48% interest in the Subordinate Voting Shares of the buyer. *See* [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A/A, SEC accession 0001104659-20-106485, doc tm2031268d1). Third, approximately two months after buying the "Gage" brand from Radicle, the buyer lent money back into the seller: on November 22, 2019, Wolverine Partners Corp. and Radicle entered into a twelve percent (12%) secured convertible debenture in the principal amount of up to CAD $1,000,000, of which CAD $500,000 had been advanced as of the offering circular. *Id.* This buyer-to-seller financing is pleaded as evidence of the non-arm's-length relationship and, together with the September 16, 2019 transfer, as tracing for Count IV, and is not pleaded as a predicate act under 18 U.S.C. §§ 1341 or 1343. Fourth, the buyer's contemporaneous related-party brand investments — a $1,000,000 convertible promissory note into Cookies Creative Consulting & Promotions, LLC and a $1,500,000 capital investment into Mesh Ventures LLC, both dated February 20, 2019 — further document the interlocked, non-arm's-length structure through which the enterprise assembled the misappropriated brand portfolio. *Id.* These interlocks confirm that the

September 16, 2019 transfer of the "Gage" brand was executed among principals standing on both sides of the transaction, not at arm's length (Paragraphs 36, 75A).

## C. THE WOLVERINE FORM 1-A OMISSIONS

37. On September 1, 2020, Wolverine Partners Corp. filed SEC Form 1-A. Wolverine Partners amended that filing on September 14, 2020 and September 18, 2020. See [Exhibits L-M] (CIK 0001810254).

38. The Wolverine Form 1-A and its amendments materially omitted (a) the prior commercial use of the GAGE Marks held by Plaintiff and Gage Green Group (documented since 2011 and claimed since 2008), and (b) the TTAB priority-opposition risk presented by Plaintiff's then-pending Opposition No. 91252169 filed November 4, 2019. See [Exhibits L-M] and [Exhibits C-D].

39. The Wolverine Form 1-A also disclosed substantial related-party transactions, including $10,150,000 in real-estate transactions between Defendant Michael Hermiz's wholly-owned entities and Wolverine Partners Corp., and $1,350,000 in related-party transactions involving Defendant Rami Reda. See [Exhibits L-M] (SEC Form 1-A, Wolverine Partners Corp., CIK 0001810254).

## D. THE OCTOBER 12, 2020 LICENSE AGREEMENT

40. On October 12, 2020, Defendants Monaco (President and Director), Linton (Executive Chairman and Director), Watza (Chief Financial Officer), and Hermiz (Director) executed an internal License Agreement concerning the "Gage" mark, transmitted via interstate mail and electronic carrier from Ontario, Canada to Michigan. See [Exhibit Z] (October 12, 2020 Gage-brand License Agreement, Gage Growth Corp. signature page, produced by Dentons LLP in TTAB Opposition No. 91252169 discovery).

## E. THE TERRASCEND ACQUISITION

41. On September 1, 2021, TerrAscend Corp. announced a definitive arrangement agreement to acquire Gage Growth Corp. in an all-stock transaction valued at approximately **$545,000,000** based on TerrAscend's closing share price on August 31, 2021 — an exchange ratio of 0.3001 TerrAscend shares per Gage share, implying consideration of $2.11 (C$2.66) per Gage share and an approximately 18% premium, as announced in TerrAscend's September 1, 2021 press release and current report (SEC EDGAR CIK 0001778129). The transaction closed on March 10, 2022; by the closing date, following a decline in TerrAscend's share price between announcement and closing, the total consideration was valued at approximately **$386,000,000** ($1.50 per Gage share as of March 9, 2022). See [Exhibit H] (TerrAscend Corp.

Form 8-K filed March 14, 2022, SEC EDGAR CIK 0001778129). Plaintiff refers to the transaction by its announced value of approximately $545,000,000, and notes the realized closing value of approximately $386,000,000 for completeness; the constructive-trust and damages relief Plaintiff seeks is measured by the portion of the consideration attributable to the misappropriated GAGE goodwill, in an amount to be proven, and not by either gross figure.

42. The TerrAscend 8-K omitted disclosure of the TTAB Opposition risk presented by Plaintiff's then-pending Opposition No. 91252169.

## F. THE AEY CAPITAL / AEY HOLDINGS ALTER-EGO OPERATION

43. Between 2019 and June 27, 2025, the TerrAscend enterprise operated nine (9) Michigan-licensed cannabis retail locations under the "Gage" / "Gage Cannabis" brand — within a twenty-store Michigan retail platform that, under separate banners, also operated five "Cookies," five "Pinnacle Emporium," and one "Lemonnade" location (Paragraph 8; [Exhibit K]). The Michigan-licensed entity within that operation, AEY Capital LLC, executed a Michigan Cannabis Regulatory Agency Consent Order and Stipulation in Formal Complaint ENF 22-00499 (AUP000138). The Consent Order was signed on behalf of AEY Capital LLC by Defendant Lynn Gefen in her capacity as Manager of AEY Capital LLC, while she simultaneously held the position of Chief Legal Officer

of TerrAscend Corp. See [Exhibit G] (Michigan CRA Consent Order ENF 22-00499).

44. On January 15, 2026, AEY Capital LLC (also under Defendant Lynn Gefen's management) — as the lead entity of a joint venture whose participating entities include Defendant AEY Holdings LLC, Thrive Enterprises LLC, and Pure Releaf SP Drive, LLC — filed a Michigan LARA Certificate of Assumed Name (Document No. 27835986) securing the assumed name "Gage Cannabis Company" through December 31, 2031, notwithstanding the imminent TTAB Show-Cause posture and the public reporting by TerrAscend Corp. that simultaneously characterized the Michigan operations as discontinued. See [Exhibit W-1] (Michigan LARA Certificate of Assumed Name, Document No. 27835986 — AEY Capital LLC joint venture) and [Exhibit K] (TerrAscend Form 8-K filed 2025-06-30).

## G. THE 2025 MICHIGAN EXIT

45. On June 27, 2025, TerrAscend Corp. publicly announced its exit from the State of Michigan, including the closure of its twenty (20) Michigan retail locations and the termination of 236 employees (per the Worker Adjustment and Retraining Notification filed June 30, 2025). See [Exhibit K] (SEC EDGAR Form 8-K, CIK 0001778129, filed 2025-06-30), and the corresponding Worker

Adjustment and Retraining Notification Act ("WARN") filing with the Michigan Department of Labor and Economic Opportunity dated June 30, 2025.

### H. THE 2025–2026 ASSET EXTRACTION, RECEIVERSHIP, AND ABANDONMENT

45A. Following the June 27, 2025 Michigan exit, the FG Loan administrative agent commenced the receivership over the Michigan GAGE-branded entities pleaded in Paragraph 16A (Oakland County Circuit Court No. 2026-222791-CB). Through 2026 the receiver liquidated the former "Gage"-branded Michigan retail operations to a succession of unrelated operators, each of which rebranded away from the GAGE Marks — including transfers of former Gage locations to Lume Cannabis Co. and Mint Cannabis, and the rebranding of the Burton location (1234 North Center Road) to "Gramz," on information and belief as reflected in Michigan Cannabis Regulatory Agency adult-use licensing records. On information and belief, the Michigan Receivership Entities were insolvent at the time of these transfers and the receivership estate was underwater — its liabilities exceeded its assets and the estate was dominated by the senior secured lien — such that liquidation proceeds are applied to the secured debt and leave nothing for Plaintiff or other unsecured claimants. This dissipation of the assets into which the misappropriated GAGE brand equity

had been converted was undertaken with actual intent to hinder, delay, or defraud Plaintiff and other creditors, and constitutes a further voidable transfer within the limitations period (Count IV).

45B. Contemporaneously, the enterprise abandoned the very trademark it had misappropriated. On June 15, 2026, as reflected in the public USPTO TSDR record for Serial No. 87695693 (of which Plaintiff requests judicial notice), the United States Patent and Trademark Office recorded the abandonment of the GAGE application, U.S. Serial No. 87695693, for failure to file a Statement of Use following the Notice of Allowance; that record lists the application's status as "Abandoned". [Exhibit OO]. The abandonment confirms that Defendants extracted the value of the misappropriated brand while allowing the federal application to lapse, and it eliminates any bona fide intent to maintain the bare-GAGE federal application, Serial No. 87695693. Plaintiff does not plead abandonment of the GAGE brand itself; the enterprise's continuing infringing use of the GAGE Marks is pleaded in Paragraph 45D.

45C. The 2025–2026 conduct is a continuation of the same pattern pleaded in Counts II and III: having misappropriated the GAGE Marks (2018–2019) and monetized them through the acquisition (2022), the enterprise completed the scheme by extracting the Michigan operating value and dissipating the residual

assets beyond creditors' reach (2025–2026) while abandoning the mark — conduct that satisfies the continuity requirement of *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).

45D. **The Michigan exit was geographically limited; the enterprise continues.** Defendants' June 27, 2025 withdrawal was from the State of Michigan only, not a cessation of business. As disclosed in TerrAscend Corp.'s Fiscal Year 2025 Form 10-K, Defendant TerrAscend continues to conduct vertically-integrated, licensed cannabis cultivation and retail operations in Pennsylvania, New Jersey, Maryland, and California, and retail operations in Ohio and Ontario, Canada. See [Exhibit I] (TerrAscend FY2025 Form 10-K, SEC EDGAR CIK 0001778129). The misappropriated GAGE goodwill was thus converted into, and remains embedded in, an ongoing multi-state cannabis enterprise; the wind-down of the specific Michigan GAGE retail banner and the lapse of the federal GAGE application (Paragraphs 45A–45B) neither returned that goodwill or its traceable proceeds to Plaintiff nor moots Plaintiff's claims for a constructive trust, damages, or injunctive relief. On information and belief, Defendants continue to exploit the GAGE-derived brand equity and the co-defendant Cookies marks in those continuing operations. Defendants undertook and continued this conduct with knowledge of Plaintiff's senior claim to the

GAGE Marks — knowledge established by their participation in TTAB Opposition No. 91252169 (which they prosecuted) and Opposition No. 91278331 (which they filed and allowed to proceed to judgment), and by the internal License Agreement pleaded in Paragraph 40 — rendering the misappropriation knowing and willful for purposes of 15 U.S.C. § 1117 and the specific-intent element of Counts II and III.

45E. **The TerrAscend Chief Legal Officer's August 18, 2022 dated admission of knowledge.** Independent of the TTAB record and the internal License Agreement, Defendants' knowledge of Plaintiff's senior and competing claim to the GAGE Marks is fixed to a specific date by a written admission from the highest legal officer of the enterprise's public-market parent. On August 18, 2022 — approximately five months after the March 10, 2022 acquisition closing (Paragraph 41) — Defendant Lynn Gefen, writing "on behalf of TerrAscend Corporation ('Terrascend') as its newly appointed Chief Legal Officer," transmitted to Plaintiff by electronic mail (to michael@gagegreengroup.com) a letter captioned "Re: Potential Resolution / U.S. Trademark Opposition Serial No. 91/252,169" (i.e., the then-pending Opposition No. 91252169 between the parties), in which she stated: "TerrAscend recently acquired Gage Growth Corporation ('Gage Growth')

earlier this year. As a result, I have direct responsibility for all things Gage Growth." *See* [Exhibit LL] (Letter from Lynn Gefen, Chief Legal Officer, TerrAscend Corporation, to Michael Fong, dated August 18, 2022, bearing the printed caption "CONFIDENTIAL CORRESPONDENCE DISCUSSION PURSUANT TO Fed. R. Evid. 408" and the signature block "/s/ Lynn Gefen — Lynn Gefen — Chief Legal Officer — TerrAscend Corporation"). In the same letter, Defendant Gefen proposed on TerrAscend's behalf that the enterprise would "Expressly abandon the GAGE (Plain Letter) application," would "Consent to your use of the GAGE GREEN GROUP mark (in standard or stylized form)," and would "Consent to your registration of the GAGE GREEN GROUP (stylized) mark," and she characterized the proposal as an agreement by which the parties would "step back from any claims of exclusive rights in the broadest form of the GAGE trademark and, instead, ... co-exist and ... allow each other to use narrower versions of the mark designed to avoid potential consumer confusion." [Exhibit LL] The letter is thus a contemporaneous written acknowledgment, by TerrAscend's own Chief Legal Officer, that as of August 18, 2022 the enterprise knew of Plaintiff's use of and application to register the GAGE GREEN GROUP mark, knew the parties' marks presented a potential for "consumer confusion," and was prepared to abandon its own GAGE (Plain

Letter) application and to consent to Plaintiff's use and registration of GAGE GREEN GROUP.

45F. **Purpose for which Paragraph 45E is pleaded; Federal Rule of Evidence 408.** Plaintiff pleads the August 18, 2022 letter, notwithstanding its "Fed. R. Evid. 408" caption, only for a purpose that Rule expressly permits and not for any purpose it forbids. Plaintiff does not offer the letter, and does not rely upon it, "to prove or disprove the validity or amount of" the disputed trademark claim, Fed. R. Evid. 408(a); Plaintiff does not plead it as an admission of liability on the merits of the opposition, as a concession of the parties' respective priority, or as a measure of damages. Plaintiff offers it solely "for another purpose," Fed. R. Evid. 408(b): to establish (a) that as of August 18, 2022 the Chief Legal Officer of TerrAscend Corporation — the enterprise's public-market parent, which she described as having "direct responsibility for all things Gage Growth" — had actual, contemporaneous knowledge of Plaintiff's competing use of, and application to register, the GAGE GREEN GROUP mark and of the potential for consumer confusion; (b) that the enterprise's continuing use of the GAGE Marks thereafter (Paragraphs 43–45D), including AEY Capital LLC's January 15, 2026 Certificate of Assumed Name securing "Gage Cannabis Company" through December 31, 2031

(Paragraph 44), was undertaken with that knowledge and was therefore knowing and willful for purposes of 15 U.S.C. § 1117(a); (c) the "defendant's intent," the seventh factor of the likelihood-of-confusion analysis (Paragraph 59A), in that the enterprise continued to deploy the GAGE mark against a source it knew claimed that mark; and (d) the knowledge and specific-intent elements of the RICO claims pleaded in Counts II and III (Paragraphs 66–74). The absence of good faith is further evidenced by the enterprise's about-face: notwithstanding its Chief Legal Officer's August 18, 2022 written offer to abandon the GAGE (Plain Letter) application and to consent to Plaintiff's use and registration of GAGE GREEN GROUP, the enterprise thereafter prosecuted the TTAB oppositions against Plaintiff's GAGE filings pleaded in Paragraphs 3 and 45D and continued its own use of the GAGE Marks in the Michigan retail market. The letter is independently admissible as a statement of a party opponent under Federal Rule of Evidence 801(d)(2), made by TerrAscend's own Chief Legal Officer within the scope of her authority, and it corroborates the single-business-enterprise and alter-ego allegations of Paragraph 11: its author simultaneously served as Chief Legal Officer of TerrAscend Corporation and as Manager of the AEY Michigan licensee entities (Paragraphs 15–16, 21, 43) and admitted "direct responsibility for all things

Gage Growth." *See* [Exhibit LL]. Ms. Gefen renewed the offer in writing on August 30, 2022, in an electronic-mail message on which Plaintiff was copied, stating that "[w]e continue to believe there is a path towards co-existence and welcome discussions" while announcing that, "[i]n view of Gage Specialties' silence to my offer to resolve the matter," Gage Growth Corp. "intends to file a Notice of Opposition" against Plaintiff's Application Serial No. 90/324,487 "by tomorrow" — the opposition thereafter docketed as Opposition No. 91278331 (Paragraphs 3, 45D). The August 30, 2022 message is retained natively in Plaintiff's own mailbox (Message-ID <MN2PR16MB326138D3518D45D600E26380B9799@MN2PR16MB3261.namprd16.prod.outlook.com>) and is included as a supplemental page to Exhibit LL.

## I. THE 2026 TTAB JUDGMENT AND POST-JUDGMENT CONCEALMENT

46. On March 3, 2026, the TTAB issued a Show-Cause Order in Opposition No. 91278331 directing Opposer (Defendant Gage Growth Corp.) to show cause why the opposition should not be dismissed for failure to take testimony. *See* [Exhibit B] (TTABVUE 91278331 Entry 40).

47. On March 12, 2026 — the same day the Show-Cause Order was issued — TerrAscend Corp. filed its Fiscal Year 2025 Form 10-K with the SEC, omitting

any disclosure of the Opposition or its show-cause posture. See [Exhibit I] (SEC EDGAR CIK 0001778129, FY2025 Form 10-K filed 2026-03-12) (10-K).

48. On May 6, 2026, the TTAB entered final judgment with prejudice against Opposer (Gage Growth Corp.) in Opposition No. 91278331. *See* [Exhibit A] (TTABVUE 91278331 Entry 41).

49. On May 7, 2026 — one business day after the final TTAB judgment — TerrAscend Corp. filed its Q1-2026 Form 10-Q with the SEC, omitting any subsequent-event disclosure of the judgment. See [Exhibit J] (SEC EDGAR CIK 0001778129, Q1-2026 Form 10-Q filed 2026-05-07) (10-Q).

## J. THE COOKIES WEB-PRESENCE PRIORITY ANCHOR

50. Defendant Cookies' first archived web presence (cookiessf.com) is dated March 7, 2013, and its first substantive content (an apparel/clothing line described as launched as a federal-trademark workaround for cannabis-related branding) is dated October 12, 2013. See [Exhibit P] (Internet Archive Wayback Machine CDX records for gagegreen.org and cookiessf.com); [Exhibit U] (Cookies' own publication "Where It All Started — A Look Back at the Origins of Cookies," cookies.co/blog).

51. Plaintiff's earliest archived commercial web presence at gagegreen.org is dated April 3, 2011, with the full commercial cannabis-genetics website

operational by July 9, 2011 ([Exhibit N]; [Exhibit P] (Internet Archive Wayback Machine CDX records)). The approximately twenty-three (23) month gap before Defendant Cookies' first archived web presence (March 7, 2013) supports Plaintiff's senior commercial-use priority over Defendant Cookies' branded use. Moreover, even by Cookies' own account, its earliest *claimed* use of the COOKIES mark postdates Plaintiff's documented use: Cookies SF LLC's federal registration for the COOKIES apparel mark (U.S. Serial No. 86697479, Reg. No. 5,319,867) claims a first-use date of December 1, 2011 and a first-use-in-commerce date of February 8, 2012 — both later than Plaintiff's commercial web presence documented in February and April 2011, and both self-asserted rather than adjudicated. Plaintiff requests judicial notice of the United States Patent and Trademark Office records for Serial No. 86697479.

52. The instances of Defendants' engagement with Plaintiff's social-media presence pleaded in this Complaint are drawn from Plaintiff's recovered records; Federal Rule of Civil Procedure 15 governs any amendment.

## K. THE DOMINGUE CONFLICT OF INTEREST

52A. Plaintiff retained legal consultation from Defendant Jennifer Lynn Domingue during her association with Defendant Cannabis Legal Group. Plaintiff paid Cannabis Legal Group for that consultation, conducted by

Domingue and concerning Plaintiff's rights in the GAGE Marks dispute, through multiple in-person meetings at Cannabis Legal Group's offices, 520 N Main St, Royal Oak, Michigan. *See* [Exhibit AA] (Plaintiff's correspondence of record documenting the attorney-client relationship with Defendant Domingue and the conflict as it was flagged in real time — Plaintiff's Gmail thread of March 29, 2021 with its thirteen attached screenshots, and Plaintiff's attorney Rex Brabson's April 1, 2021 reply that Wolverine should be removing Ms. Domingue from anything to do with the Opposition proceeding; and the September 20, 2021 City of Owosso Council Packet showing Defendant Domingue completing a marihuana license amendment application on behalf of Defendant AEY Holdings LLC, d/b/a "Gage Cannabis Company," as "Attorney," using the enterprise email address legal@gageusa.com).

53. After receiving Plaintiff's compensation and Plaintiff's confidential information on the GAGE Marks dispute, Defendant Domingue undertook representation adverse to Plaintiff within the same GAGE Marks dispute — the September 2021 Owosso licensing representation of Defendant AEY Holdings LLC d/b/a "Gage Cannabis Company," and, on information and belief, work for Defendant Gage Growth Corp. (acting under its former name Wolverine

Partners Corp.) in connection with TTAB Opposition No. 91252169 — without disclosure to Plaintiff and without written informed consent. See [Exhibit AA].

54. As documented in the Brabson correspondence and the Owosso conflict record ([Exhibit AA]), Defendant Domingue's conduct violated Michigan Rule of Professional Conduct 1.9 (duties to former clients) and Michigan Rule of Professional Conduct 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). Defendant Cannabis Legal Group, through Defendant Barton W. Morris, Jr. as supervising attorney and owner, is liable in respondeat-superior for Defendant Domingue's misconduct.

## L. THE DEFENDANT DOMAIN PORTFOLIO

55. Defendants registered, trafficked in, or used domain names that incorporate Plaintiff's GAGE Marks and confusingly-similar variants, including without limitation: **gageorange.com** and **gagegreens.com** (both registered December 19, 2019 — forty-five (45) days after Plaintiff filed Opposition No. 91252169 against the Defendant enterprise). Each domain's registration date is confirmed by the authoritative Verisign registry's RDAP records (gageorange.com registered 2019-12-19T19:16:42Z; gagegreens.com registered 2019-12-19T19:17:01Z — twenty seconds apart) ([Exhibit Y]), and each domain's attribution to the Defendant enterprise is established by Defendants' own

document production: their registrar's export of "the list of domain name[s] for Gage USA," produced by Wolverine Partners Corp. in TTAB discovery, lists both domains in the enterprise's own GoDaddy account with registration timestamps matching the registry records to the second. See [Exhibit E] (Wolverine Partners Bates production WOLV000118–WOLV000120). Plaintiff further alleges, on information and belief, that any "since 2006" use of gagegreen.com asserted in the TTAB record was not a bona fide commercial use, the domain having resolved only to Afternic parking nameservers rather than an active commercial website; Plaintiff does not concede any senior bona fide use by Defendants. The registrations pleaded in this Paragraph are two of the fifty-eight (58) GAGE-formative domain names in the enterprise's own registrar portfolio list, produced by Defendant Wolverine Partners Corp. as WOLV000118–WOLV000120 and pleaded in Paragraphs 61–65. *See* [Exhibit E].

56. Defendants registered and used the "sucks"-suffix domains, including gagegreengroupsucks.com, with a bad-faith intent to disparage Plaintiff and Plaintiff's exact mark "GAGE GREEN GROUP."

## VI. COUNT I — FALSE DESIGNATION OF ORIGIN, UNFAIR COMPETITION, AND INFRINGEMENT OF REGISTERED AND UNREGISTERED MARKS UNDER SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

57. Plaintiff incorporates by reference Paragraphs 1 through 56 above.

58. Plaintiff claims senior use of the GAGE Marks in commerce, supported by the continuous-use record pleaded in Paragraphs 31–32 and 50–51. Trademark rights flow from prior appropriation and actual use in the market, and bona fide continuous use suffices to establish a protectable interest and priority of use even without extensive market penetration. *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir. 1998). Plaintiff asserts priority of actual marketplace use de novo in this Court; the TTAB found the GAGE Marks inherently distinctive and not generic in Opposition No. 91252169 but expressly declined to reach likelihood of confusion in that registration proceeding.

58A. Two federal registrations further evidence the protectability of the marks at issue and are pleaded here as evidence (Section 43(a)/§1125(a) protects both registered and unregistered marks and does not require the plaintiff to be the registrant of record): (a) Registration No. 8,268,743 for GAGE GREEN GROUP (International Class 025), issued May 26, 2026 (Serial No. 90324487); and (b) Registration No. 7,402,223 for GGG covering hemp-derived-seed

goods, registered May 28, 2024 (Serial No. 88527221). See USPTO Reg. Nos. 8,268,743 and 7,402,223 (public USPTO records). Title to these registrations is consolidated in Gage Prestige Holdings LLC through the recorded nunc-pro-tunc wind-up pleaded in Paragraphs 10 and 31(c) (USPTO Reels 8419/0700 and 8419/0719; TSDR display-field conformance pending under 15 U.S.C. § 1057(g)); Plaintiff is the senior principal to whom the underlying bona fide use and goodwill are attributable and pleads the registrations as evidence of the marks' protectability, not as the basis of a registrant's Section 32 claim.

58B. **Lawful-use foundation; anticipated "unlawful use" defense.** Plaintiff's protectable interest and priority do not depend on federally unlawful conduct. Plaintiff's continuous-use record includes goods and services lawful under federal law at all relevant times: clothing (International Class 025, the class of Registration No. 8,268,743); educational materials, media, and publication services; and, from and after the Agriculture Improvement Act of 2018, hemp and hemp-derived seed goods within the definition of 7 U.S.C. § 1639o — the subject matter of Registration No. 7,402,223 — which that Act removed from the Controlled Substances Act's definition of marijuana. *See AK Futures LLC v. Boyd Street Distro, LLC*, 35 F.4th 682 (9th Cir. 2022) (hemp-derived products lawful under the 2018 Act may support trademark priority). Plaintiff's priority

in the lawful Class 025 goods does not depend on the timing of any cannabis-related use. Registration No. 8,268,743 (Serial No. 90324487) is a use-based registration under 15 U.S.C. § 1051(a) for clothing that claims a date of first use in commerce of November 13, 2012, and is prima facie evidence of the validity of the registered mark, of the registrant's ownership of the mark, and of the exclusive right to use the mark on those goods. 15 U.S.C. §§ 1057(b), 1115(a). Plaintiff pleads these statutory presumptions to establish the validity and protectability of the GAGE Marks generally — an element common to registered and unregistered marks under Section 43(a) — and not as a claim of personal ownership or registrant status, which Plaintiff disclaims (Paragraphs 10, 32B, 58A). Plaintiff's priority in the lawful Class 025 goods rests primarily on the November 13, 2012 first-use-in-commerce date claimed in Registration No. 8,268,743, corroborated by neutral third-party vendor records dated March and April 2014, pleaded in Paragraph 31(d)(iv) and filed as [Exhibit N-4] — including Forward Printing's April 2014 print run affixing the "GGG Cross" (Gage Green Group) mark to garments — documenting Plaintiff's contemporaneous apparel operation senior to the enterprise's October 2018 launch of the misappropriated GAGE brand, so that Plaintiff's priority in the lawful goods rests on documented commercial use and neither depends upon,

nor is defeated by disregarding, any cannabis-related use. The federal "lawful use in commerce" requirement is goods-specific: it withholds federal rights only in the particular goods that are unlawful under the Controlled Substances Act and does not taint separately-pleaded lawful goods in the same portfolio. The Trademark Trial and Appeal Board's cannabis registration refusals are not to the contrary; in each, the refusal reached the entirety of the application precisely because every good or service before the Board was itself federally unlawful, leaving no separately-pleaded lawful goods to survive — the opposite of Plaintiff's portfolio, which independently includes lawful Class 025 apparel and post-2018 hemp goods. *Cf. In re JJ206, LLC*, 120 U.S.P.Q.2d 1568 (T.T.A.B. 2016) (affirming refusal of registration where the entire application covered cannabis vaporizer goods unlawful under federal law); *In re PharmaCann LLC*, 123 U.S.P.Q.2d 1122 (T.T.A.B. 2017) (affirming refusal of marks for marijuana-dispensary retail and dispensing services on the same per se ground). Those decisions are registrability rulings of the Board, not infringement determinations of an Article III court, and neither reached the question presented here — whether separately-pleaded lawful goods support priority notwithstanding a party's additional cannabis-related use. Moreover, Plaintiff's lawful Class 025 apparel and hemp goods are closely related to, and within the

natural zone of expansion of, the cannabis goods on which the parties compete: cannabis brands and their apparel move through the same channels to the same consumers, as Defendant Cookies' own origin story confirms — Cookies itself launched an apparel line as a federal-trademark workaround for its cannabis-related branding (Paragraph 50). Plaintiff's senior use of the GAGE Marks on related lawful goods therefore supports priority reaching the cannabis-retail marketplace under the related-goods and natural-zone-of-expansion doctrines, independent of any priority in the cannabis goods themselves. Any cannabis-related use is therefore disregarded for purposes of federal priority — not treated as disqualifying the lawful Class 025 apparel and hemp-goods use on which Plaintiff's federal priority independently rests. To the extent any Defendant invokes the judicially-created "unlawful use" doctrine against the cannabis-related components of Plaintiff's use, that doctrine has no purchase in this forum: the Lanham Act's text nowhere conditions trademark protection on compliance with other federal statutes; the Court of Appeals for the Sixth Circuit has never adopted the doctrine; and the only Michigan federal court squarely presented with it declined to adopt it, reasoning that Congress did not expressly condition trademark protection on compliance with other federal laws and refusing to add a requirement not found in the statute itself. *Breeze Smoke,*

*LLC v. Yatin Enters., Inc.*, No. 1:22-cv-1182, slip op. at 11–12 (W.D. Mich. Apr. 25, 2023) (ECF No. 74) (declining to adopt the unlawful-use doctrine). *Accord Perry v. H.J. Heinz Co. Brands, LLC*, 994 F.3d 466 (5th Cir. 2021) ("this court has not adopted the unlawful use doctrine"); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071 (11th Cir. 2016) (affirming rejection of an unlawful-use defense without adopting the doctrine). Equity independently forecloses the defense on these facts: from 2019 through 2025, Defendants themselves sold marijuana — conduct unlawful under the federal Controlled Substances Act, 21 U.S.C. §§ 802(16), 841 — at approximately twenty Michigan retail locations under the very GAGE mark at issue. Defendants cannot claim the fruits of that commerce for themselves while invoking its illegality to deny Plaintiff's senior rights in the same marketplace; a party that comes into equity must come with clean hands.

59. Defendants used in commerce false designations of origin, and reproductions, copies, or colorable imitations of the GAGE Marks, in connection with the sale, offering for sale, distribution, or advertising of cannabis goods and related services, in a manner likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of the Defendants with Plaintiff, or as to the origin, sponsorship, or approval of

Defendants' goods or services. Plaintiff, as the senior user whose commercial interest in the GAGE Marks was diverted by Defendants' conduct, falls within the zone of interests protected by Section 43(a) and was proximately injured by the violation, and so has standing to sue. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *accord Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697 (4th Cir. 2016) (applying *Lexmark* to sustain a competitor's Section 43(a) claim for injury to commercial reputation and sales). Plaintiff sues as a competitor whose commercial interest in the GAGE Marks was diverted, not as a consumer; the consumer-standing limitation of *Serbin v. Ziebart International Corp.*, 11 F.3d 1163 (3d Cir. 1993), is therefore inapposite and, in all events, predates and was superseded by the *Lexmark* framework. The GAGE Marks are inherently distinctive and require no proof of secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992); *see* [Exhibits C-D] (TTAB distinctiveness finding, Opp. No. 91252169).

59A. Likelihood of confusion in this Circuit is governed by the eight-factor test of *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982), and *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100 (6th Cir. 1991): (1) strength of the mark; (2)

relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) purchaser care; (7) the defendant's intent; and (8) likelihood of expansion. The parties used the identical GAGE mark on identical cannabis goods through the same Michigan retail channels — an identity of mark, goods, and channel from which likelihood of confusion follows on the face of these allegations.

59B. **Actual confusion — the fourth Frisch factor.** The fourth factor enumerated in Paragraph 59A — evidence of actual confusion — is the most probative of the *Frisch* factors, and even a small number of documented instances is entitled to substantial weight; Plaintiff need not prove actual confusion in order to establish a likelihood of it. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275 (6th Cir. 1997) (evidence of actual confusion is the most probative, though not a required, showing of likelihood of confusion). Here the record is neither small nor equivocal. Real third-party consumers, writing in their own words on Plaintiff's own social-media accounts and in direct messages to those accounts, repeatedly mistook Defendants' "Gage" / "Gage Cannabis" for Plaintiff's senior GAGE house of marks, or wrote to Plaintiff in order to resolve their own confusion.

Representative instances, quoted verbatim from the recovered originals compiled as [Exhibit O], include:

a. Facebook user **David Flowers**, commenting on Plaintiff's Facebook page: "When I saw an ad for Gage Cannabis in Michigan I immediately thought it was referring to the craft cannabis company gage green which supplies high quality seeds to our patients and caregivers." A second commenter on the same post, **Mich Jones** — identified by Facebook as a "Top Fan" — added: "Yes they are confusing consumers. I'm glad I have your genetics and not some knock off." [Exhibit O-1].

b. Facebook user **Woody McDonald**: "Very confusing, I saw the GAGE dispensary and thought they were related to you guys. Then I saw the quality and I knew it couldn't be the case." A further commenter, **Erik Arizona**, added: "I was confused also......." [Exhibit O-2].

c. Facebook user **David Tracy**: "Ya, Gage in Michigan. Thought they were affiliated with you guys until I did some digging. How they gonna steal your name?" [Exhibit O-3].

d. Instagram user **stray_cat_life**, by direct message: "I've been following your friction with Gage. Everybody I talk to from Cali thought Gage was you lol." [Exhibit O-4].

e. Instagram user **realonelovepottery**: "I was confused when I saw @tricktrickgs and Berner promoting Gage Cannabis brand. I thought why name it Gage when there's Gage Green Group?" [Exhibit O-5].

f. Instagram user **voyage_bloom**, who sent Plaintiff's account a photograph of Defendants' product by direct message with the message: "I thought this was you guys...." (the message's remainder is truncated in the capture; the full-resolution original is compiled at O-6). [Exhibit O-6].

g. Instagram user **chase66j**: "Tbh I seen the gage opening from a friend and was hyped cause I thought it was you, then I seen Berner and his cookies lmaoooo." [Exhibit O-7].

h. Instagram user **carolkalvelage**, a Michigan consumer: "Things get confusing here in MI for me sometimes but now I'm glad I'm on the right road!!.. no more mistaking from here." — recounting that her husband had confused Defendants' own counter staff ("No wonder they had no clue what my husband was talking about"). [Exhibit O-8].

i. Instagram user **billysio313**, by direct message from Massachusetts: "So this is not you guys correct? Let me know please as it's at a cup near me in mass." [Exhibit O-9].

j. **Reverse confusion.** On or about January 20, 2021, Instagram user **geezwatt** commented on Defendant @gagecannabis's post advertising its Grand Rapids, Michigan operation: "Damn! I didn't know @gggnatural had a dispensary. Sign me up!" — attributing Defendants' dispensary to Plaintiff's @gggnatural mark. Rather than correct the misattribution, the @gagecannabis account replied so as to capitalize on it: "@geezwatt oh yeah, @gagecannabis is out here." [Exhibit O-10]. This exchange illustrates the reverse-confusion dynamic produced by Defendants' well-capitalized, approximately twenty-store Michigan build-out (Paragraph 43) — a consumer assuming Plaintiff's senior GAGE house of marks had itself entered the retail market, and Defendants exploiting rather than dispelling the error. Reverse confusion is a cognizable theory of liability in this Circuit. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960 (6th Cir. 1987). The market-saturation dynamic underlying this reverse confusion is corroborated by public search-interest data: a Google Trends report for the search term "Gage cannabis" (United States, 2004–present) shows no measurable United States search interest before approximately 2008, its first measurable uptick at approximately January 2009 — coincident with the period of Plaintiff's documented origination of the GAGE house of marks in cannabis — sustained moderate interest through 2017, and a rise to the report's

normalized maximum value coincident with the enterprise's 2018 Michigan retail launch, with the interest-by-subregion display concentrated in Michigan. [Exhibit SS]. Plaintiff offers this data as circumstantial corroboration of the timeline of public association and of the enterprise's market saturation, and not as proof of first use, which rests on the documented commercial use pleaded elsewhere.

k. **Authentication.** Each item comprising [Exhibit O] is authenticated by (i) the uncropped original screenshot as captured, preserving the complete post or message frame together with its embedded file metadata; (ii) the declaration of Michael Fong under Federal Rule of Evidence 901(b)(1), as a witness with personal knowledge of Plaintiff's @gagegreengroup and @gggnatural accounts and of the receipt and preservation of these communications; and (iii) corroborating captures from the Internet Archive Wayback Machine, together with platform records obtainable under Federal Rule of Civil Procedure 45. The confusion statements are offered not for their truth but as circumstantial evidence of the declarants' contemporaneous confusion as to source (Fed. R. Evid. 803(3)), and Defendants' @gagecannabis reply is a statement of a party opponent (Fed. R. Evid. 801(d)(2)). Each capture bears the platform's own date or relative timestamp as displayed at the time of capture; absolute posting dates

for the relative-timestamped items will be confirmed from platform metadata and Wayback captures. This uncropped-original-plus-declaration foundation supplies the authentication that cropped excerpts in the prior TTAB proceeding were said to lack.

Taken together, the recovered record documents approximately twenty-four distinct third-party confusion events across Facebook, Instagram, and text message — of which ten representative instances are reproduced as Exhibits O-1 through O-10 — arising among Michigan consumers and spilling over to consumers in California and Massachusetts — corroborating that the confusion generated by Defendants' identical use of the GAGE mark on identical cannabis goods is actual, consumer-level, and widespread. Additional contemporaneous instances of the same third-party confusion, drawn from Plaintiff's preserved records and authenticated on the same Federal Rule of Evidence 901(b)(1) foundation, are compiled as [Exhibit RR], including: a text-message thread in which a participant, correcting another's complaint about the enterprise's product, wrote "maybe you mean the other gage that is trying to steal their name atm"; and a direct message from an individual ("Bryan") who believed Plaintiff operated the Gage dispensary and had "a buddy that works there"

59C. **Actual confusion at the trade level and the enterprise's pre-adoption knowledge — the infringer's own retail team solicited Plaintiff by name.** The likelihood of confusion here is not a matter of inference alone; it manifested in the conduct of the enterprise's own personnel. On July 1, 2019 — more than two months before the September 16, 2019 insider transfer of the "Gage Cannabis" rights into Wolverine Partners Corp. (Paragraph 35), and more than four months before Plaintiff filed Opposition No. 91252169 on November 4, 2019 (Paragraph 38) — a member of the enterprise's "Gage Cannabis Co" retail team, Nicholas Wilkey, writing from the enterprise's own domain at nicholasw@gageusa.com (the same gageusa.com domain the enterprise used for legal@gageusa.com, Paragraphs 28 and 53), solicited Plaintiff's Gage Green Group by electronic mail sent to its gageoriginals@gmail.com account, under the subject line "Products," stating verbatim: "Hello my name is Nicholas with Gage Cannabis Co We are interested in carrying your flower please get back to me with a detailed menu with what's currently available and prices so we can set something up thanks," and signing "Nicholas / Gage Cannabis Co / Retail Team." See [Exhibit MM] (July 1, 2019 email, Nicholas Wilkey <nicholasw@gageusa.com> to <gageoriginals@gmail.com>, subject "Products," retained natively in the

receiving Gmail account, bearing native Message-ID <DM5PR22MB09877F0331F96823017BD175BCF90@DM5PR22MB0987.namprd22.prod.outlook.com>, authenticated by its gageusa.com sender domain, by that native Message-ID, and by the declaration of Michael Fong, who received the message at Gage Green Group's own account (Fed. R. Evid. 901(b)(1), (b)(4))). This communication is probative on two of the *Frisch's* factors enumerated in Paragraph 59A. First, as to actual confusion (factor four): the enterprise's own retail agent approached the senior user not as a distinct and competing brand but as an interchangeable "Gage" source of cannabis flower to be "carried" and "set[] . . . up" under the junior's retail operation — a paradigmatic instance of reverse confusion, in which the larger, better-financed junior user (then expanding toward the approximately twenty (20) Michigan retail locations pleaded in Paragraphs 8 and 43) so saturates the trade that even its own personnel treat the senior user's goods as a supply line to be absorbed under the junior's banner; where a defendant's own employees do not distinguish the marks, confusion among ordinary consumers is a fortiori likely. Reverse confusion is a cognizable theory of liability in this Circuit. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960 (6th Cir. 1987); *see* Paragraph 59B(j). Second, as to Defendants' intent (factor seven) and

willfulness: the July 1, 2019 solicitation is direct documentary proof that the enterprise possessed actual, particularized knowledge of Plaintiff's Gage Green Group — its name, its cannabis goods, and its contact channel — before it acquired the "Gage Cannabis" rights (September 16, 2019) and before every act of adoption, expansion, United States registration, and monetization of the GAGE brand that followed. Defendants thus adopted, expanded, and monetized the GAGE brand not in good-faith ignorance but with pre-existing knowledge of the senior user they were displacing — a fact that supports a finding of knowing and willful infringement for purposes of 15 U.S.C. § 1117, and that independently reinforces the specific intent pleaded in Counts II and III (Paragraphs 45D, 68) and the bad-faith domain-registration conduct pleaded in Paragraphs 61–65.

59D. **Anticipated laches defense — the delay is excused and unprejudicial, and in all events bars only pre-filing damages.** Plaintiff anticipates that Defendants will assert laches. Because the Lanham Act supplies no limitations period, this Circuit borrows the analogous Michigan statute — the three-year period for injury to property, MCL 600.5805 — and treats a delay beyond it as presumptively prejudicial and unreasonable, measured from the date the plaintiff acquired actual or constructive knowledge of the infringing activity.

*Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002). That presumption is rebuttable, and a plaintiff overcomes it by any one of three independent showings: rebutting the presumption of prejudice, establishing a good excuse for the delay, or showing that the defendant engaged in particularly egregious conduct that shifts the equities in the plaintiff's favor. *Id.* at 408-09. Each is satisfied here.

a. **Good excuse — progressive encroachment.** Laches presupposes that the plaintiff slept on a claim already ripe; the clock does not run while the junior user's infringement is still developing into one worth suing upon. Where a junior user begins some infringing use and then directs its marketing and expansion so as to place itself more squarely in competition with the senior user, the senior user's delay is excused, and the period of delay is measured only from the point at which the infringement "ripened into a provable claim." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-71, 573 (6th Cir. 2000) (progressive encroachment is an "offensive countermeasure" to laches; upon a finding of progressive encroachment, "the delay upon which [laches is] premised is excused"). That is this case. When the enterprise launched the "Gage Cannabis Co." brand in October 2018, and when its retail agent solicited Plaintiff in July 2019 (Paragraph 59C), it was a nascent operation, not the

market-saturating presence that produced the reverse-confusion injury pleaded here. The actionable harm ripened only as the enterprise — financed by the related-party transactions pleaded in Paragraphs 33 through 45 — progressively built out to the approximately twenty (20) Michigan retail locations pleaded in Paragraphs 8 and 43, so saturating the trade that consumers, and even the enterprise's own personnel, began attributing Plaintiff's senior GAGE house of marks to the junior user (Paragraphs 59B(j), 59C) — the reverse-confusion dynamic cognizable in this Circuit under *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960 (6th Cir. 1987). Measured from that progressive encroachment, Plaintiff's action is timely; the very delay Defendants would invoke is the delay progressive encroachment excuses.

b. **No prejudice — and diligent, not negligent, protection of rights.** Laches is the "negligent and unintentional failure to protect one's rights," *Nartron*, 305 F.3d at 408 (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)), and neither element is present. Plaintiff did not sleep on his rights: he continuously and actively asserted the GAGE Marks against the enterprise before the Trademark Trial and Appeal Board, filing Opposition No. 91252169 on November 4, 2019 (Paragraph 38) and litigating that opposition together with Opposition No. 91278331 — proceedings squarely

contesting the parties' competing claims to the GAGE Marks — through the Board's April 29, 2025 decision and its July 11, 2025 reconsideration denial (Paragraphs 3-4). A senior user in continuous, active adversarial proceedings against the junior user over the same marks is not negligently or unintentionally abandoning his rights. Nor can Defendants show the detrimental reliance that laches prejudice requires: they adopted, expanded, and monetized the GAGE brand with actual, particularized pre-adoption knowledge of Plaintiff and his senior use (Paragraph 59C — the July 1, 2019 solicitation from the enterprise's own domain), so their build-out was not undertaken in good-faith reliance on any silence by Plaintiff. A junior user who proceeds with knowledge of the senior user cannot claim the expectations-based prejudice on which the laches presumption depends.

c. **Particularly egregious conduct shifting the equities.** Even were delay and prejudice otherwise shown, the presumption yields where the defendant's conduct is particularly egregious. *Nartron*, 305 F.3d at 408-09. The conduct pleaded here is of that character: knowing and willful infringement undertaken with documented pre-adoption knowledge of the senior user (Paragraph 59C); the acquisition and monetization of a brand the enterprise knew to be senior to its own use; the bad-faith registration of the fifty-eight (58) GAGE-formative

domain names pleaded in Paragraphs 61 through 65; and the acquisition of Plaintiff's confidences by Defendant Domingue while she acted adversely to him within the same GAGE Marks dispute (Section XI). A party seeking the equitable shelter of laches must come into equity with clean hands, and — as pleaded in Paragraph 58B — from 2019 through 2025 Defendants themselves sold marijuana under the very GAGE mark at issue in violation of the federal Controlled Substances Act; they cannot invoke equity to bar the senior user's claim while holding the fruits of that same conduct.

d. **In all events, laches would bar only pre-filing damages.** Even if a laches defense were sustained, it would not defeat this action. Laches bars only damages that accrued before suit was filed; it does not bar prospective injunctive relief or post-filing relief. *Nartron*, 305 F.3d at 412; *Kellogg*, 209 F.3d at 569-70. Plaintiff's core relief is therefore available irrespective of any pre-filing time-bar: the injunction against Defendants' continued use of the GAGE Marks, and the constructive trust over the traceable proceeds of the misappropriation pleaded in Count IV — a distinct equitable claim governed by the Michigan Uniform Voidable Transactions Act and its own limitations period, not by the Lanham Act laches analysis. Plaintiff's monetary claim under 15 U.S.C. § 1117 is asserted consistent with these principles and, as pleaded in

Paragraphs 59C and 60, rests on the knowing and willful character of Defendants' infringement.

60. Defendants' conduct violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), entitling Plaintiff to injunctive relief, damages, an accounting of Defendants' profits, attorneys' fees, and costs under 15 U.S.C. § 1117.

## VII. DEFENDANTS' DOMAIN-REGISTRATION CONDUCT AS EVIDENCE OF BAD FAITH AND WILLFUL INTENT

61. Defendants' own discovery production establishes the scope of the enterprise's GAGE domain-name portfolio. A July 25, 2020 electronic-mail message from a GoDaddy representative to the enterprise's own account ("Info@Gage" <info@gageusa.com>), produced by Defendant Wolverine Partners Corp. in TTAB Opposition No. 91252169 as WOLV000118–WOLV000120, transmits what its author describes as "the list of domain name for Gage USA": fifty-eight (58) GAGE-formative domain names with registration timestamps. *See* [Exhibit E].

62. The portfolio's own timestamps trace the enterprise's occupation of Plaintiff's namespace: (a) gage.ca on August 31, 2016; (b) fifteen domains across September 22–23, 2017 — including twelve gagecannabis-formative names and gagehemp/gagehashish variants — approximately two months before the enterprise's first United States trademark filing; (c) eight gagelife-

formative names on November 6, 2017; (d) seventeen gagegrowth-formative names on September 1, 2019, fifteen days before the September 16, 2019 Asset Purchase Agreement (Paragraph 35; [Exhibit KK]); and (e) five domains registered in a single twenty-second burst on December 19, 2019, between 2:16:41 and 2:17:01 PM as recorded in the enterprise's own GoDaddy list: gagegreengroupsucks.com, gagegreens.com, gagegreensucks.com, gageorange.com, and gageworldwide.com. The Verisign registry's authoritative RDAP records independently confirm the burst (gageorange.com registered 2019-12-19T19:16:42Z; gagegreens.com registered 2019-12-19T19:17:01Z). *See* [Exhibits E, Y]; Paragraph 55.

63. The December 19, 2019 burst came forty-five (45) days after Plaintiff filed Opposition No. 91252169 against the enterprise (November 4, 2019; Paragraph 38). The enterprise's own produced record ([Exhibit E], WOLV000118–120) shows the burst's sequence: it BEGAN with the disparagement domains — gagegreensucks.com and gageworldwide.com at 2:16:41 PM, gageorange.com at 2:16:42 PM, gagegreengroupsucks.com at 2:16:44 PM, and gagegreens.com at 2:17:01 PM. In under half a minute the enterprise registered two domains incorporating Plaintiff's GAGE GREEN formative and two "sucks"-suffix domains constructed from Plaintiff's exact marks — disparagement vehicles

with no function except to target Plaintiff (Paragraph 56). The same produced list shows a further post-Opposition cluster on January 18, 2020 (gagecalifornia.com, gageflorida.com, gagemassachusetts.com, gagemichigan.com, and gageusa.co).

64. This conduct — mass registration of GAGE-formative domains beginning before any trademark filing, a seventeen-domain cluster on the eve of the insider Asset Purchase Agreement, and a retaliatory twenty-second burst targeting Plaintiff's exact marks weeks after Plaintiff commenced proceedings against the enterprise — evidences Defendants' knowledge of Plaintiff's senior rights, their intent to occupy and dilute Plaintiff's namespace, and their willfulness for purposes of 15 U.S.C. § 1117(a) and the seventh *Frisch's* factor (Paragraph 59A), and further supports the specific-intent elements of the RICO counts.

65. Plaintiff pleads the domain-name conduct in this Section as evidence of bad faith, willfulness, and intent in support of Count I and the RICO counts; no separate claim under 15 U.S.C. § 1125(d) is pleaded in this action.

## VIII. COUNT II — CIVIL RICO UNDER 18 U.S.C. § 1962(C)

66. Plaintiff incorporates by reference Paragraphs 1 through 65 above, and each and every factual allegation set forth in Sections III through V (Paragraphs 10–

56) is realleged as if fully set forth herein. Counts II and III are pleaded in the alternative to, and cumulatively with, Counts I and IV. Plaintiff's primary vehicles for redress of the misappropriation of the GAGE Marks and their goodwill are Count I (Section 43(a) of the Lanham Act), which protects that goodwill directly, and Count IV (constructive trust and the Michigan Uniform Voidable Transactions Act), which reaches the traceable proceeds of the misappropriation directly. Counts II and III do not depend upon, and Plaintiff's core relief does not require, characterizing the diverted goodwill of the GAGE Marks as itself property "obtained" within the meaning of 18 U.S.C. §§ 1341 and 1343; the property those predicates allege the enterprise obtained is set forth in Paragraph 68 and Paragraph 68D.

## A. THE ENTERPRISE

67. Defendants and Does 1–10 formed an association-in-fact enterprise (the "GAGE Misappropriation Enterprise") engaged in and the activities of which affected interstate and foreign commerce. The enterprise possessed the three structural features required by *Boyle v. United States*, 556 U.S. 938, 946 (2009): (a) a common purpose — the misappropriation, monetization, and concealment of the GAGE Marks; (b) relationships among those associated with the enterprise — the Reda-family sellers, the Wolverine/Hermiz buyers, the Gage

Growth and TerrAscend acquirers, and the Cookies retail partner, linked through the related-party transfers pleaded in Paragraphs 33–45; and (c) longevity sufficient to permit the associates to pursue the enterprise's purpose, spanning no later than November 22, 2017 through the present. The enterprise is an entity distinct from the pattern of racketeering activity in which it engaged. The association-in-fact enterprise is likewise distinct from each Defendant named as a RICO "person" in Count II (Paragraph 67A), because the enterprise comprises additional members — including the Reda-family seller entities, the Cookies retail partner, and Does 1–10 — beyond any single corporate Defendant; the alter-ego allegations of Paragraph 11 are pleaded for veil-piercing and collection, not to equate any RICO "person" with the enterprise.

67A. **Operation or management.** Each Defendant named in this Count participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 183, 185 (1993). In this Circuit a defendant so participates "either by making decisions on behalf of the enterprise or by knowingly carrying them out." *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 494 n.6 (6th Cir. 2013) (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)); *accord Ouwinga v. Benistar 419 Plan Services, Inc.*,

694 F.3d 783 (6th Cir. 2012). Both the upper-rung participants who directed the enterprise's affairs and the lower-rung participants who knowingly executed those directions are liable, as are outsiders who took part in operating or managing the enterprise even without holding a formal position. *Reves*, 507 U.S. at 184–85. This Count is asserted only against the Defendants whose operation-or-management acts are pleaded: **TerrAscend Corp., Gage Growth Corp., AEY Holdings LLC, and AEY Capital LLC**, the operating entities that made and executed the enterprise's misappropriation, licensing, assumed-name-renewal, and proceeds-diversion decisions — AEY Capital LLC being the Michigan cannabis-licensed entity through which the enterprise operated the nine (9) GAGE-branded Michigan retail locations and which executed the Michigan Cannabis Regulatory Agency instruments governing that operation (Paragraphs 16, 43), thereby conducting the enterprise's core retail affairs; and **Defendants Fabian Monaco, Bruce Linton, David Watza, Michael Hermiz, Michael Finos, and Lynn Gefen**, the officers and agents who made or knowingly carried out those decisions (Paragraphs 68(a)–(c), 29A, 43). The remaining Defendants are named not in this Count but in the § 1962(d) conspiracy pleaded in Count III.

## B. PATTERN OF RACKETEERING ACTIVITY

68. The Defendants named in this Count (Paragraph 67A) conducted or participated in the conduct of the GAGE Misappropriation Enterprise through a pattern of racketeering activity comprising the predicate acts set forth below. Plaintiff does not predicate this claim on Defendants' securities-disclosure omissions in their SEC filings: although those omissions are pleaded in Paragraphs 37–38, 42, 47, and 49 as evidence of the enterprise's concealment and its knowledge of the misappropriation, Plaintiff recognizes that 18 U.S.C. § 1964(c) bars reliance on conduct actionable as fraud in the purchase or sale of securities, and Plaintiff accordingly grounds the pattern on the non-securities mail-fraud and wire-fraud predicates enumerated here. The "money or property" the enterprise schemed to and did obtain within the meaning of 18 U.S.C. §§ 1341 and 1343 is the purchase money of the Michigan consumers who, deceived by the passing-off of counterfeit product as genuine GAGE goods, paid for it — an acquisitive obtaining of transferable property from deceived parties. The diversion of Plaintiff's own goodwill is pleaded as Plaintiff's injury under 18 U.S.C. § 1964(c) (Paragraphs 69B–71), not as the property object of the predicate acts. The property object of the predicates is analyzed in Paragraph 68D. The predicates are:

a. **Mail Fraud and Wire Fraud — Obtaining Consumers' Purchase Money by Passing Off Counterfeit GAGE Goods (October 2018 through June 2025).** From the enterprise's October 2018 launch of the "Gage" / "Gage Cannabis" retail operation through TerrAscend's June 27, 2025 Michigan exit, the enterprise, acting through AEY Capital LLC and AEY Holdings LLC and their officers, used the United States mails and interstate wires in furtherance of and to execute a scheme to obtain the purchase money of Michigan cannabis consumers by passing off product bearing a counterfeit "GAGE" mark as genuine goods of the senior GAGE house of marks. Pleaded with the particularity Federal Rule of Civil Procedure 9(b) requires: (i) WHO — AEY Capital LLC, the Michigan cannabis licensee (Paragraph 16), and its retail personnel operating the nine (9) GAGE-branded locations (Paragraphs 8, 43), directed by the officers named in Paragraph 67A; (ii) WHAT — the material misrepresentation, communicated by the counterfeit GAGE branding affixed to the product and the retail signage, that the cannabis sold under the GAGE name at those locations originated with, or was authorized, sponsored, or approved by, the senior user of the GAGE Marks, when it was not; (iii) WHEN — continuously from the October 2018 launch through the June 27, 2025 exit; (iv) WHERE — the enumerated Michigan retail locations (Paragraph 8); and (v)

HOW and WHY — the counterfeit GAGE branding itself conveyed the false representation of source to each purchasing consumer, who in reliance on it paid money that passed from the deceived consumer to the enterprise. The counterfeit-source representation was material to the consumer's decision to part with money, as the contemporaneous, consumer-level actual confusion pleaded in Paragraphs 59A–59C demonstrates. The scheme was executed and furthered by use of the United States mails, which for purposes of 18 U.S.C. § 1341 need not cross state lines, and by interstate wire — including the enterprise's own October 12, 2020 interstate transmission of the License Agreement from Ontario, Canada to Michigan (subparagraph (b)) and the enterprise's interstate marketing, advertising, and menu-pricing of the counterfeit GAGE brand in furtherance of the scheme. Representative of the sums consumers paid the enterprise for counterfeit GAGE goods are the enterprise's own published retail offerings during the period: counterfeit "Gage"-branded cannabis flower ("5th Dimension | Gage") listed for retail sale at $45.00 per one-eighth ounce, and premium "Gage"-branded cannabis concentrate sold through the enterprise's Cookies-Michigan retail channel at a $90.00 retail price. [Exhibit PP]. Such sums were paid to the enterprise across the nine (9) GAGE-branded Michigan retail locations (Paragraph 8) throughout the October 2018 through June 27,

2025 period. That consumers parted with their money in reliance on the counterfeit GAGE source-representation is demonstrated by the contemporaneous, consumer-level actual confusion of record — including a Michigan consumer who mis-attributed a purchased counterfeit "Gage" product to Plaintiff by tagging it with Plaintiff's own "#gagegreengenetics" mark [Exhibit PP], and consumers who messaged Plaintiff that they had mistaken the enterprise's product for Plaintiff's genuine goods (Paragraphs 59A–59C). The consumers' payment of money induced by the counterfeit GAGE branding is money "obtained" within the meaning of §§ 1341 and 1343, and is no less obtained because the consumer received non-genuine product in return. *See* 18 U.S.C. §§ 1341, 1343; *Kousisis v. United States*, 605 U.S. 114 (2025); *cf.* *United States v. Hucks*, 557 F. App'x 143, 145–46 (3d Cir. 2014). That Plaintiff was not himself the deceived purchaser is no obstacle to Plaintiff's civil-RICO claim: a plaintiff proceeding on mail-fraud predicates need not have relied on the misrepresentation, and third-party reliance by the deceived consumers suffices. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 649, 658 (2008).

b. **Mail Fraud and Wire Fraud (October 12, 2020).** Defendants Monaco, Linton, Watza, and Hermiz, together with other officers and directors of Gage

Growth Corp., executed and transmitted the October 12, 2020 License Agreement concerning the misappropriated "Gage" mark via U.S. Mail or commercial interstate carrier, and by interstate wire, from Ontario, Canada to Michigan, in furtherance of the scheme pleaded in subparagraph (a) to obtain money and property by deception — the licensing and inter-affiliate deployment of the counterfeit "Gage" mark into the Michigan retail operation being a step in executing that scheme, through which the enterprise obtained deceived consumers' purchase money, and in monetizing its proceeds. *See* 18 U.S.C. §§ 1341, 1343; [Exhibit Z] (License Agreement, produced by Dentons LLP in TTAB Opposition No. 91252169 discovery). The scheme and the deceptive intent are pleaded with particularity in Paragraphs 36A, 40, and 45D–45F: the acquisition instrument's own knowledge carve-out and covenant to defend the anticipated opposition ([Exhibit KK], §§ 3.2(d), 6.2(f)); the License Agreement's first-right-to-sue and brand-ownership clauses (Paragraph 40); and the enterprise's continued deployment of the GAGE Marks after dated written knowledge of Plaintiff's senior claim (Paragraphs 45D–45F; [Exhibit LL]).

c. **Wire Fraud and Mail Fraud (January 15, 2026).** AEY Capital LLC (Lynn Gefen, Manager), as the lead entity of a joint venture that includes Defendant AEY Holdings LLC, transmitted via the Michigan LARA electronic filing

system the Certificate of Assumed Name (Document No. 27835986) securing the "Gage Cannabis Company" assumed name through December 31, 2031, in furtherance of the continued misappropriation and concealment of the GAGE Marks, while TerrAscend Corp.'s contemporaneous public reporting characterized the Michigan brand operations as discontinued. The filing was a half-truth directed at the State of Michigan and the consuming public: it secured the "Gage Cannabis Company" name through December 31, 2031 while the enterprise's contemporaneous public reporting characterized the Michigan operations as discontinued (Paragraphs 44–45C), concealing the enterprise's continued occupation of Plaintiff's mark-space. *See* 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud); [Exhibit W-1].

68D. **The property object of the mail- and wire-fraud predicates.** The "money or property" the enterprise obtained through the predicate acts is traditional property in the most literal sense — the money of deceived consumers (subparagraph (a)) — property already in the hands of those victims and transferred from them to the enterprise. That satisfies each governing limit on the property element: it is "property in the hands of the victim," *Cleveland v. United States*, 531 U.S. 12, 15 (2000); it is a traditional property interest long recognized as property, not an intangible right to control information or an

economic expectancy of the kind held non-cognizable in *Ciminelli v. United States*, 598 U.S. 306 (2023); and it was the object of the scheme, not an incidental byproduct of it, *Kelly v. United States*, 590 U.S. 391 (2020). The obtaining is acquisitive: the enterprise both deprived the victims of their money and acquired that transferable money for itself. *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 404–05 (2003) (obtaining requires "not only the deprivation but also the acquisition of property" that the taker can "exercise, transfer, or sell"). This distinguishes the mere diversion of a competitor's goodwill, which is a deprivation without a corresponding acquisition and therefore not an obtaining. *Cf. Monterey Plaza Hotel Ltd. P'ship v. Local 483*, 215 F.3d 923, 926–27 (9th Cir. 2000) (conduct that "may have been vexatious or harassing, but . . . was not acquisitive" does not obtain property). The enterprise here was acquisitive — it took deceived consumers' purchase money across the approximately twenty (20) Michigan locations and carried the captured value into the March 10, 2022 acquisition realized at approximately $386,000,000 (Paragraph 41). Plaintiff does not plead the goodwill of the GAGE Marks itself as the property "obtained" by the predicate acts; Plaintiff's own goodwill, attributable to him as the senior user (Paragraphs 10, 58B), is pleaded as intangible business property in Plaintiff's hands and as

the measure of Plaintiff's injury under § 1964(c) (Paragraphs 70–71), consistent with the recognition that intangible business property is protected by the mail and wire fraud statutes. *Carpenter v. United States*, 484 U.S. 19, 25–26 (1987).

## C. CONTINUITY PLUS RELATIONSHIP

69. The predicate acts enumerated in Paragraph 68(a)–(c) (a) span the period from the enterprise's October 2018 launch of the counterfeit "Gage" brand (Paragraph 68(a)) through the January 15, 2026 Certificate of Assumed Name, with continuing counterfeit use of the GAGE mark at approximately twenty (20) Michigan retail locations through TerrAscend's June 27, 2025 Michigan exit; (b) share the common participants identified in Paragraph 6; (c) share the common purposes of misappropriating, monetizing, and concealing the GAGE Marks; (d) target the same victims — Plaintiff and Plaintiff's GAGE Marks, and the Michigan consumers whose purchase money the enterprise obtained by deceiving them into buying counterfeit "GAGE" cannabis goods (Paragraph 68(a)) — together with a secondary victim, the Michigan Cannabis Regulatory Agency; and (e) deploy the same methods, namely interstate wire and mail transmission of false or materially-omitting communications, use of nominee corporate entities (Wolverine Partners Corp. → Gage Growth Corp.; AEY Capital LLC → AEY Holdings LLC), and the deployment of related-party non-

arms-length transfers as concealment vehicles. The pattern satisfies the **continuity-plus-relationship test** of *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239–243 (1989) (open-ended continuity established where the predicate acts include a specific threat of repetition or are part of an ongoing entities' regular way of doing business; closed-ended continuity established where related predicates extend over a substantial period of time). Both forms of continuity are independently established, and Plaintiff's claim does not rest on either alone. **Closed-ended continuity (primary).** The related predicate acts extend over a substantial closed period — from the enterprise's October 2018 launch of the counterfeit "Gage" retail operation (Paragraph 68(a)) through TerrAscend's June 27, 2025 Michigan exit (Paragraphs 8, 43, 45) — a span of approximately six years and eight months of continuous counterfeit deployment of the GAGE Marks across the approximately twenty (20) Michigan retail locations. That duration is a "substantial period of time," *H.J. Inc.*, 492 U.S. at 242, far exceeding the "few weeks or months" the Supreme Court held insufficient, *id.*, and exceeding the single-victim spans the Sixth Circuit has rejected, *see Vemco, Inc. v. Camardella*, 23 F.3d 129, 133–34 (6th Cir. 1994) (single scheme to defraud one plaintiff over seventeen months insufficient). Critically, this is not the "single scheme, single injury, and few victims" case in

which a long duration is discounted. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 724–25 (6th Cir. 2006). The pattern inflicted distinct injuries on multiple, distinct classes of victims: (i) the Michigan cannabis consumers across the nine (9) GAGE-branded locations, deceived into surrendering their purchase money throughout the period (Paragraph 68(a)); (ii) Plaintiff, the senior user, whose GAGE goodwill was diverted (Paragraphs 70–71); (iii) the Michigan Cannabis Regulatory Agency and the Michigan filing authorities, to whom the enterprise directed the false and half-true licensing and assumed-name communications enumerated in Paragraph 68(b)–(c); and (iv) the unsecured creditors of the receivership estate, injured by the related-party dissipation of the misappropriated GAGE-derived value pleaded in Count IV (Paragraphs 45A, 77). The Sixth Circuit has sustained civil RICO liability on materially analogous multi-victim facts — a multi-entity association-in-fact that monetized a fraudulent scheme through a sustained pattern of mail and wire fraud injuring numerous victims. *West Hills Farms, LLC v. ClassicStar Farms, Inc.*, 727 F.3d 473 (6th Cir. 2013); *accord Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 409–11 (6th Cir. 2012) (reversing dismissal of a multi-victim mail- and wire-fraud-predicated civil RICO claim). That the enterprise later withdrew from Michigan does not defeat closed-ended

continuity; it merely fixes the terminal date of the closed period. **Open-ended continuity (pleaded in the alternative).** In the alternative, the predicate acts satisfy open-ended continuity because they were "part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242–43. The counterfeit-consumer-deception predicate pleaded in Paragraph 68(a) was not an isolated transaction or an inherently terminable scheme with a built-in ending point; it was the enterprise's usual, normal, and customary way of conducting its Michigan retail business — every counterfeit-branded retail sale at the nine (9) GAGE-branded locations, day after day, throughout the period of operation, executed the scheme. *Cf. Moon*, 465 F.3d at 725; *Heinrich*, 668 F.3d at 410–11 (distinguishing single-victim schemes possessing "a built-in ending point"). Whether that conduct threatened continued racketeering activity is assessed from the totality of the circumstances as of the time the racketeering activity occurred, *Heinrich*, 668 F.3d at 410, when the enterprise's counterfeit retail operation was ongoing and indefinite and was terminable only by external intervention rather than by any internal, goal-completing endpoint. The enterprise's subsequent January 15, 2026 filing of the Certificate of Assumed Name securing the "Gage Cannabis Company" name through December 31, 2031 (Paragraph 68(c)) — executed while its public reporting simultaneously

characterized the Michigan operations as discontinued — further corroborates that the enterprise reserved rather than relinquished the misappropriated GAGE mark-space. A fraud-predicated civil RICO claim pleading continuity of either form states a claim in this Circuit. *West Hills Farms*, 727 F.3d 473; *Heinrich*, 668 F.3d 393.

69A. **Standing under Sedima.** Plaintiff has suffered injury to Plaintiff's business or property by reason of the violation of 18 U.S.C. § 1962, satisfying the standing requirements of *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495–500 (1985) (the civil RICO plaintiff must show (a) a violation of § 1962, (b) injury to business or property, and (c) causation of the injury by the violation). All three elements are pleaded with particularity in Paragraphs 70 and 71 below.

69B. **Proximate cause: the passing-off was a direct, substantial, and foreseeable cause of Plaintiff's injury.** A civil-RICO plaintiff must show that the § 1962 violation was both a but-for and a proximate cause of the injury — "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *accord Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). In this Circuit that requirement is met where the defendant's wrongful conduct was

"a substantial and foreseeable cause" of the injury and the relationship between the conduct and the injury is "logical and not speculative." *West Hills Farms, LLC v. ClassicStar Farms, Inc.*, 727 F.3d 473, 490 (6th Cir. 2013) (quoting *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004)). Plaintiff's injury satisfies that standard directly. Plaintiff is the senior user of the GAGE house of marks; the passing-off predicate pleaded in Paragraph 68(a) — the enterprise's deployment of the counterfeit GAGE mark across the approximately twenty (20) Michigan retail locations (Paragraph 8), and within the limitations period from August 13, 2022 through TerrAscend's June 27, 2025 Michigan exit, extended by the January 15, 2026 assumed-name renewal (Paragraph 68(c)) — diverted to the enterprise, in a single step and by a single act, the trade of the very consumers who sought genuine GAGE goods. The same counterfeit-source representation that induced each deceived consumer to part with his purchase money simultaneously, and by the identical act, withheld that consumer's trade from Plaintiff. Applying the same common-law proximate-cause principles that govern § 1964(c), the Supreme Court has held that precisely this injury — the injury that "occurs when deception of consumers causes them to withhold trade from the plaintiff" — is one "flowing

directly from the deception." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (Paragraph 32B).

This case is the inverse of *Anza*. There, the competitor's lost sales were too remote because two discontinuities separated them from the fraud: the injurious act (the competitor's decision to lower prices) was "entirely distinct" from the RICO violation (defrauding the State), and the competitor "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," so that proving the plaintiff's damages "would require a complex assessment." *Anza*, 547 U.S. at 458–459. Neither discontinuity exists here. There is no independent intervening act: the predicate — passing off counterfeit GAGE product as genuine — is itself the act of diversion, not a separate business choice that the fraud merely made possible. And there is no speculative apportionment: the trade diverted is the trade of consumers deceived by the counterfeit GAGE source-representation itself (Paragraphs 59A –59C), the direct and intended object of the scheme, not a diffuse loss of custom attributable to lawful competition. That Plaintiff was not himself the deceived purchaser does not make his injury derivative, for the party a mail- or wire-fraud scheme deceives need not be the party it directly injures: "[a] scheme that injures D by making false statements through the mail to E is mail

fraud, and actionable by D through RICO if the injury is not derivative of someone else's." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 649–650 (2008) (quoting *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007), and sustaining the direct injury of competing bidders whom the scheme did not address).

Nor does the property object pleaded in Paragraphs 68 and 68D render Plaintiff's injury derivative of the consumers'. The consumers are the direct victims of one injury — the deprivation of their purchase money — and that injury supplies the money-or-property object of the §§ 1341 and 1343 predicates (Paragraph 68D). Plaintiff is the direct victim of a distinct injury — the diversion of his own trade, goodwill, and licensing opportunity — for which no consumer is a better-situated plaintiff and which no consumer will ever sue to recover. The two injuries do not overlap: a consumer's recovery of his purchase money and Plaintiff's recovery of his diverted sales and goodwill count no dollar twice, so this case presents neither the duplicative recovery nor the intractable apportionment that the directness requirement exists to prevent. *See Holmes*, 503 U.S. at 269. As to the trade-diversion injury for which Plaintiff sues, Plaintiff is the immediate victim, no intermediate victim's independent loss stands between the predicate conduct and the harm, and the causal relation

is logical rather than speculative. Plaintiff does not rest on the broad proximate-cause analysis of *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), which commanded only a plurality; the result there barred a municipality's suit to recover tax revenue lost through a third party's failure to file reports — a causal chain with no counterpart to the single-act diversion pleaded here.

69C. **First-party reliance not required under Bridge.** Plaintiff need not allege personal reliance on Defendants' fraudulent representations. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648–658 (2008) (a private RICO plaintiff alleging mail-fraud predicates need not show first-party reliance — the only reliance required is the reliance of the immediate victim of the fraud, which here includes the Michigan consumers deceived into purchasing counterfeit "GAGE" cannabis goods and the Michigan licensing authorities to whom the assumed-name and license-agreement communications enumerated in Paragraph 68(b)–(c) were directed); *accord Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393 (6th Cir. 2012) (applying *Bridge*; reversing dismissal of a mail/wire-fraud-predicated civil RICO claim where first-party reliance was absent).

69D. **Domestic injury under RJR Nabisco.** Plaintiff alleges a domestic injury to business or property within the meaning of *RJR Nabisco, Inc. v. European*

*Community*, 579 U.S. 325 (2016). Although certain Defendants are Canadian, Plaintiff's injured property interests are domestic: United States common-law and applied-for federal trademark rights in the GAGE Marks, the goodwill of those marks in the United States market, and the diversion of that goodwill through the operation of approximately twenty (20) Michigan retail locations. The misappropriated proceeds were realized through, and the predicate acts were directed into and consummated within, the United States.

### D. INJURY TO PLAINTIFF IN PLAINTIFF'S BUSINESS OR PROPERTY

69E. **Direct personal injury.** The enterprise's conduct reached Plaintiff personally and directly: its own retail team solicited Plaintiff by name through Plaintiff's own account (Paragraph 59C; [Exhibit MM]); its public-market parent's Chief Legal Officer wrote to Plaintiff personally, twice, acknowledging Plaintiff's competing use and then opposing Plaintiff's application (Paragraphs 45E–45F; [Exhibit LL]); confused consumers wrote into Plaintiff's own accounts to resolve the confusion the enterprise created (Paragraph 59B; [Exhibits O-1 through O-10]); and the enterprise's Michigan counsel accepted Plaintiff's own confidences before appearing adverse to him (Paragraphs 52A–54; [Exhibit AA]).

69F. **Separate and distinct injury.** Plaintiff's injuries are separate and distinct from any injury to the record title held by Gage Prestige Holdings LLC. They arise from wrongs done directly to Plaintiff — the enterprise's solicitation of Plaintiff by name, the personal correspondence its Chief Legal Officer directed to him, and the consumer confusion routed to Plaintiff's own accounts (Paragraph 69E) — and from goodwill attributable to Plaintiff as the senior principal of the continuous use that generated it (Paragraph 10), predating and separate from the record title later consolidated in Gage Prestige Holdings LLC. That is an injury to Plaintiff's own business or property within the meaning of 18 U.S.C. § 1964(c). *See Medical Marijuana, Inc. v. Horn*, 604 U.S. ___ (2025) (a § 1964(c) plaintiff may recover for business or property loss); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985). It also satisfies the direct-relationship requirement of *Anza* and *Hemi Group* pleaded in Paragraph 69B. Plaintiff sues only for his own injury; any diminution in the record title belongs to Gage Prestige Holdings LLC and is not asserted here.

69G. **The securities transaction was incidental, not integral to the pattern pleaded in this Count.** The predicate acts on which this Count rests — including the October 12, 2020 License Agreement mail and wire fraud (Paragraph 68(b)) and the January 15, 2026 assumed-name-renewal mail and

wire fraud (Paragraph 68(c)) — each defrauded a non-investor victim (respectively, the senior trademark owner and the deceived consumers, and the State of Michigan and its consuming public), and each was complete and actionable without any purchase or sale of a security. The misappropriation and diversion of Plaintiff's goodwill was consummated through that license agreement, the counterfeit retail use, and the assumed-name concealment; none of those acts operated on, coincided with, or depended upon any securities transaction. The March 10, 2022 all-stock share exchange was itself lawful and performed exactly as marketed; it was not the fraud, but only the enterprise's later method of realizing, in corporate form, the proceeds of a collateral fraud directed at a trademark owner. In this Circuit the § 1964(c) bar applies only where the securities transaction was "integral to or 'in connection with' the fraudulent scheme as a whole," and does NOT apply where "the fraud and the securities transactions were essentially independent events." *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, slip op. at 6–8 (6th Cir. 2012). The securities here are incidental: the deception operated on a trademark owner and a state licensing authority, not on the purchase or sale of a security or on securities-market investors. Plaintiff pleads this per predicate and factually, and

not as a legal conclusion that no person could ever state a securities claim on these facts.[^69g]

[^69g]: Plaintiff's allegations of Defendants' securities-disclosure omissions (Paragraphs 37–38, 42, 47, 49) are pleaded solely as evidence of the enterprise's concealment and knowledge of the misappropriation, and are not relied upon as predicate acts; Plaintiff recognizes the § 1964(c) bar and does not predicate this Count on any conduct actionable as fraud in the purchase or sale of securities.

70. Plaintiff suffered injury to Plaintiff's business or property, by reason of Defendants' conduct of the enterprise through the pattern of racketeering activity, including without limitation: (a) the diversion of Plaintiff's personal business — lost sales of GAGE-branded genetics and merchandise, lost licensing and royalty opportunities, and the diminution of the personal brand equity Plaintiff built from 2008 forward — as the enterprise deployed the misappropriated GAGE Marks in interstate commerce through the approximately twenty (20) Michigan retail locations it operated from August 13, 2022 to the June 27, 2025 Michigan exit; (b) the diversion of consumer recognition and association in the Michigan retail market during the in-window (August 13, 2022 – June 27, 2025) operation of nine TerrAscend Michigan locations under the GAGE brand, within its twenty-store Michigan platform;

and (c) the corresponding diminution in Plaintiff's own commercial interest in reputation and sales and in the personally-generated goodwill arising from Plaintiff's own continuous use of the GAGE Marks — injury separate and distinct from any diminution in the marks' record title or registration held by Gage Prestige Holdings LLC (Paragraph 69F).

71. The Defendants named in this Count (Paragraph 67A) are jointly and severally liable to Plaintiff under **18 U.S.C. § 1964(c)**, which provides that a person injured in his business or property by reason of a violation of § 1962 "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Plaintiff need not plead or prove a "racketeering injury" distinct from the harm caused by the predicate acts. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985) (holding that § 1964(c) imposes no distinct "racketeering injury" requirement beyond injury caused by the predicate acts). Plaintiff does not seek the acquisition consideration (announced at approximately $545,000,000 and valued at approximately $386,000,000 at closing — Paragraph 41), or any portion of it, as damages under 18 U.S.C. § 1964(c), and does not offer that consideration as a measure of Plaintiff's RICO damages. Plaintiff's recoverable RICO sum is the separately-proven, in-window goodwill-attributable injury from the enterprise's

counterfeit Michigan retail deployment (Paragraphs 69B, 70), trebled under § 1964(c), in an amount to be proven at trial. The acquisition consideration is relevant only to Count IV, where it is pleaded as specific, identifiable, traceable proceeds subject to a constructive trust (Paragraph 77), and not as the object of, or as damages arising from, any purchase or sale of a security.

71A. **Timeliness; injury-discovery accrual, separate accrual, and the scope of recoverable injury.** Civil RICO claims are governed by a four-year limitations period borrowed from the Clayton Act. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987). That period runs from the date the plaintiff knew, or in the exercise of reasonable diligence should have known, that he was injured by the RICO violation; it is discovery of the injury — not of the other elements of the claim or of the full pattern — that starts the clock. *Rotella v. Wood*, 528 U.S. 549, 554–55 (2000); *Isaak v. Trumbull Savings & Loan Co.*, 169 F.3d 390, 399 (6th Cir. 1999). Plaintiff pleads his claim within that framework and confines it to injury that accrued within the limitations period. Plaintiff acknowledges that he discovered the enterprise's misappropriation of the GAGE Marks no later than his filing of Opposition No. 91252169 before the Trademark Trial and Appeal Board in November 2019 (Paragraph 55), and Plaintiff does not seek, under Counts II or

III, to recover for any injury he sustained before the limitations period. Under the separate-accrual rule, however, each new and independent predicate act that inflicts a new and accumulating injury on the plaintiff within the four-year period is separately actionable and its resulting injury separately recoverable, even though earlier acts of the same pattern fall outside the period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997); *see Peck v. General Motors Corp.*, 894 F.2d 844, 847–49 (6th Cir. 1990) (a cause of action "accrues and the limitations period commences each time a defendant commits an act which injures the plaintiff's business," with "the focus . . . on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts"). The predicate acts on which Plaintiff's recovery rests are separate and independent acts of that character committed within the four years preceding the August 13, 2026 filing of the original Complaint — to which this First Amended Complaint relates back under Federal Rule of Civil Procedure 15(c)(1)(B) — that is, from August 13, 2022 forward: the enterprise's continuing execution, through the mail- and wire-furthered passing-off of counterfeit GAGE goods at its Michigan retail locations from August 13, 2022 through the June 27, 2025 Michigan exit (Paragraph 68(a)), each such transaction deceiving a new consumer and diverting a further, discrete increment of Plaintiff's sales

and goodwill; and the January 15, 2026 Certificate of Assumed Name securing the "Gage Cannabis Company" name through December 31, 2031 (Paragraph 68(c)), a fresh act of misappropriation and concealment directed at the State of Michigan and the consuming public. Each was a new and independent act, not a mere reaffirmation of the enterprise's earlier conduct, and each inflicted new and accumulating injury on Plaintiff within the limitations period. Consistent with *Klehr*, Plaintiff does not rely on any in-window act to revive injury sustained outside the period, and the earlier predicate acts pleaded in Paragraph 68 — including the October 12, 2020 License Agreement (Paragraph 68(b)) — are pleaded to establish the relationship and continuity of the pattern of racketeering activity required by 18 U.S.C. § 1962(c) (Paragraph 69), not as a basis for damages. Plaintiff's recoverable injury under Counts II and III is accordingly limited to the in-window injury pleaded in Paragraphs 69B, 70, and 71, and Plaintiff neither requires nor invokes any tolling of the limitations period. This timeliness analysis applies equally to the Section 1962(d) conspiracy pleaded in Count III, the limitations period for which likewise runs from Plaintiff's discovery of his injury.

## IX. COUNT III — RICO CONSPIRACY UNDER 18 U.S.C. § 1962(D)

72. Plaintiff incorporates by reference Paragraphs 1 through 71 above.

73. Defendants knowingly agreed with each other to conduct or participate in the conduct of the GAGE Misappropriation Enterprise through the pattern of racketeering activity described above, and each Defendant acted in furtherance of that agreement through one or more of the overt acts identified herein. The conspiracy alleged in this Count reaches every Defendant regardless of whether that Defendant operated or managed the enterprise; under *Salinas v. United States*, 522 U.S. 52, 63–66 (1997), a Defendant who knowingly agreed to further the enterprise's affairs is liable under 18 U.S.C. § 1962(d) even if that Defendant did not itself conduct or manage the enterprise or commit a predicate act. The conspiracy pleaded here is among legally distinct and independently-owned actors — not only the commonly-controlled TerrAscend and Gage corporate family, but also the separately-owned Cookies Defendants, the Canopy Defendants, the Reda-family seller entities, and the independent outside-counsel Defendants — so the agreement alleged is among plural, separately-owned economic actors and is not the coordination of a single economic actor with itself or with its own wholly-owned components. The alter-ego allegations of Paragraph 11 are pleaded for veil-piercing and collection against the commonly-controlled corporate family only, and do not narrow the conspiracy, which reaches independently-owned participants outside

that family. This Count is asserted against all Defendants — including both the Defendants named in Count II (Paragraph 67A) and the remaining Defendants, among them Radicle Medical Marijuana Inc., Radicle Cannabis Holdings Inc., Spartan Partners Corporation, Spartan Partners Holdings LLC, Cannabis Legal Group, Barton W. Morris, Jr., Jennifer Lynn Domingue, the Cookies Defendants, Gilbert Milam, Jr., Jason Wild, Rami Reda, Youssef Reda, Ziad Reda, Ziad Ghanem, Canopy Growth Corporation, RIV Capital Inc., and Canopy USA, LLC — whose liability under this Count rests on their knowing agreement to further the enterprise rather than on operation or management.

73A. **The Foreign Canopy Defendants' agreement.** On information and belief, anchored to the structural facts pleaded in Paragraphs 33A-33E — RIV Capital Inc.'s 23.81% equity in the brand-source Defendant Radicle Medical Marijuana Inc.; Canopy Growth Corporation's 100% control of that venture arm; the Foreign Canopy Defendants' counterparty roles in the Arrangement Agreement that positioned the United States-market acquirer; the Linton bridge, including Defendant Linton's personal investments across Plaintiff's cannabis-genetics competitors (Paragraph 33B); and the Mavrinac interlocking directorate spanning the Canopy venture arm, the seller, and the buyer (Paragraph 33E) — Defendants Canopy Growth Corporation and RIV Capital

Inc. knowingly agreed to participate in the conduct of the GAGE Misappropriation Enterprise's affairs through the pattern of racketeering activity pleaded in Count II. A defendant may be liable under 18 U.S.C. § 1962(d) without itself committing or agreeing to commit any predicate act and without participating in the operation or management of the enterprise. *Salinas v. United States*, 522 U.S. 52 (1997). Plaintiff does not allege the Foreign Canopy Defendants' knowledge as an established fact; Plaintiff pleads their knowledge and agreement on information and belief, tied to the concrete structural facts of record above, which taken together plausibly support the inference of that knowledge and agreement.

74. Defendants are jointly and severally liable to Plaintiff under 18 U.S.C. §§ 1962(d) and 1964(c) for treble damages, costs, and reasonable attorneys' fees.

## X. COUNT IV — VOID TITLE AND FRAUDULENT TRANSFER (MICHIGAN UNIFORM VOIDABLE TRANSACTIONS ACT, MCL 566.31 ET SEQ.) AND CONSTRUCTIVE TRUST

75. Plaintiff incorporates by reference Paragraphs 1 through 65 above.

75A. **Void title (lead theory — nemo dat quod non habet).** Radicle Cannabis Holdings Inc. could convey no greater right in the "Gage" name than it held. Because the goodwill and senior use of the GAGE Marks are attributable to Plaintiff (Paragraphs 10, 31–32), Radicle held no valid, unencumbered title in

the GAGE Marks to transfer on September 16, 2019, and each successive transferee in the chain (Wolverine Partners Corp. → Gage Growth Corp. → the acquisition consideration) took subject to Plaintiff's superior pre-existing interest. A purchaser cannot acquire clean title to that which the seller did not own; Plaintiff's equitable interest in the misappropriated marks and their traceable proceeds is therefore superior to the interests of the transferees, and this action seeks to enforce that pre-existing interest. The September 16, 2019 transfer instrument and its below-market consideration are documented in [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A, CIK 0001810254). The Michigan Uniform Voidable Transactions Act theory below is pleaded in the alternative.

76. **In the alternative — voidable transfers.**

76A. **The 2025–2026 dissipation transfers (timely).** The transfers pleaded in Paragraphs 16A and 45A — effected through the May 1, 2026 forbearance agreement with the FG Loan lender syndicate (in which Defendant Wild, TerrAscend's Executive Chairman and controlling shareholder, is himself an invested lender, Paragraph 19), the ensuing May 2026 receivership application, and the liquidation of the Michigan GAGE-branded operating assets — were made or suffered with actual intent to hinder, delay, or defraud creditors of the

transferor entities, including Plaintiff, and are voidable under **MCL 566.34(1)(a)**, which reaches creditors whose claims arose before or after the transfer. The badges of fraud enumerated in **MCL 566.34(2)** present here include: transfer to or for the benefit of insiders (MCL 566.34(2)(a)) — the enterprise's controlling equity holder simultaneously stood on the creditor side of the secured facility; before the transfers the debtors had been sued or threatened with suit (MCL 566.34(2)(d)), including the TTAB proceedings concerning the GAGE Marks and Plaintiff's asserted claims; the transfers comprised substantially all of the Michigan debtors' assets (MCL 566.34(2)(e)); and the debtors were insolvent or became insolvent shortly after the transfers were made (MCL 566.34(2)(i)).

76B. **Insolvency; constructive-fraud alternative.** At the time of the 2025–2026 transfers the Michigan Receivership Entities were insolvent: as pleaded in Paragraph 45A on the basis of TerrAscend's own public disclosures, the estate's liabilities exceeded its assets, the estate was dominated by the senior secured lien, and liquidation leaves nothing for unsecured claimants. Those transfers were made without the debtors' receiving reasonably equivalent value in exchange, and are voidable in the alternative under **MCL 566.34(1)(b)** and **MCL 566.35(1)** (transfer without reasonably equivalent value by a debtor insolvent at the time or rendered insolvent thereby, as to a creditor whose claim

arose before the transfer — Plaintiff's claim arose no later than 2019 and long before the 2025–2026 transfers).

76C. **The September 16, 2019 insider transfer — pleaded as predicate and for tracing, not for MUVTA avoidance.** The September 16, 2019 transfer of the "Gage Cannabis" rights from Defendant Radicle Cannabis Holdings Inc. to Defendant Wolverine Partners Corp. for CAD $250,000 — a non-arms-length insider transaction (Paragraph 36) at a price facially below the value the enterprise itself later ascribed to the brand — is pleaded as the origin of the chain through which Plaintiff traces the misappropriated goodwill (Paragraph 75A) and as evidence of the enterprise's method and intent. Plaintiff does not seek avoidance of the 2019 transfer under the Michigan Uniform Voidable Transactions Act. The void-title and constructive-trust theories of Paragraph 75A, which arise from Plaintiff's pre-existing superior interest and not from the Act, and the timely avoidance claims of Paragraphs 76A–76B, do not depend on avoidance of the 2019 transfer; Plaintiff reserves all positions under MCL 566.39, MCL 600.5813, and MCL 600.5855 should any party place the avoidability of the 2019 transfer in issue. *See* [Exhibits L-M] (Wolverine Partners Corp. SEC Form 1-A documenting the CAD $250,000 consideration).

77. Plaintiff seeks the creditor's remedies available under **MCL 566.37** as to the 2025–2026 transfers pleaded in Paragraphs 76A–76B: avoidance of those transfers to the extent necessary to satisfy Plaintiff's claim (MCL 566.37(1)(a)); attachment or other provisional remedy against the assets transferred or their traceable proceeds (MCL 566.37(1)(b)); and an injunction against further disposition by Defendants of the transferred assets or their proceeds (MCL 566.37(1)(c)(i)). Plaintiff further seeks imposition of a **constructive trust** over the specific, identifiable, traceable proceeds of the misappropriated GAGE Marks — namely the consideration the enterprise itself paid for the brand on September 16, 2019 (Paragraph 35): (i) the CAD $250,000 in cash that Radicle received, together with its traceable distribution to Radicle's equity holders in proportion to their pleaded interests, including the 23.81% share attributable to Defendant RIV Capital Inc. (Paragraphs 33A, 77A); and (ii) the 250,000 contingent Subordinate Voting Shares that comprised the balance of that purchase consideration, to the extent issued, and their traceable conversion — the issuer having been renamed Gage Growth Corp. and its shares exchanged at the 0.3001 ratio pleaded in Paragraph 41 — into TerrAscend shares now held by the recipients of that consideration. Plaintiff traces that brand-sale consideration into the Defendants' hands under established principles of

equitable tracing, including the lowest-intermediate-balance rule as to any commingled cash, and seeks the trust only over proceeds so traceable, and not over property any Defendant acquired from independent, non-brand sources. Plaintiff pleads the approximately $386,000,000 all-stock value realized in the March 10, 2022 TerrAscend acquisition (Paragraph 41) not as the res of the constructive trust and not as a measure of recovery — that consideration took the form of TerrAscend shares issued to the selling shareholders of Gage Growth Corp. and purchased an operating enterprise beyond the mark — but solely as evidence of the value the enterprise ultimately realized from the misappropriated GAGE goodwill. A constructive trust is appropriate under Michigan law to prevent unjust enrichment where property is obtained through fraud, misrepresentation, or concealment. *Blachy v. Butcher*, 221 F.3d 896 (6th Cir. 2000). Plaintiff asserts a **pre-existing equitable and beneficial interest in those specific, identifiable, traceable proceeds**, and does **not** seek to restrain Defendants' general assets to secure a money judgment; the relief sought is therefore the constructive-trust and fraudulent-conveyance relief expressly preserved by *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 & n.7 (1999), and is not the bare asset freeze that decision forbids. Plaintiff acknowledges that under **MCL 566.38** a person who took in

good faith and for reasonably equivalent value, including a good-faith secured lender, takes free of avoidance to the extent of the value given; Plaintiff's avoidance and constructive-trust remedies are directed to the transferees who received the misappropriated goodwill and its traceable proceeds, and not to any perfected security interest of a good-faith lender in the receivership collateral. Plaintiff does not seek priority over any federal tax lien.

77A. **The Canopy Defendants as constructive-trust beneficiaries.** The constructive trust over the traceable proceeds of the misappropriated GAGE Marks (Paragraph 77) extends to Defendants Canopy Growth Corporation, RIV Capital Inc., and Canopy USA, LLC, each of which holds an identifiable interest into which the misappropriated GAGE goodwill was converted: RIV Capital Inc. (f/k/a Canopy Rivers Inc.) through its 23.81% equity interest in the brand-source Defendant Radicle Medical Marijuana Inc. and its resulting share of the consideration Radicle received on the September 16, 2019 sale of the brand (Paragraphs 33A, 35; [Exhibits CC, L-M]); Canopy Growth Corporation through that same controlled interest and through its direct holding of 19,445,285 TerrAscend Exchangeable Shares (Paragraph 33C; [Exhibit EE]); and Canopy USA, LLC through its holding of 24,601,467 TerrAscend Exchangeable Shares acquired December 9, 2022 (Paragraph 33D; [Exhibit I]).

Under Michigan law a constructive trust may be imposed upon identifiable property, or its traceable proceeds, held by a party — including a party innocent of wrongdoing — where retention would unjustly enrich that party at the expense of the person to whom the property in equity and good conscience belongs. *Kammer Asphalt Paving Co. v. East China Township Schools*, 443 Mich. 176 (1993); *Kent v. Klein*, 352 Mich. 652 (1958); *Blachy v. Butcher*, 221 F.3d 896 (6th Cir. 2000). The relief sought against each Canopy Defendant is limited to the portion of its interest attributable to the misappropriated GAGE goodwill, in an amount to be proven, and does not reach any interest supported by value the Canopy Defendant gave. Plaintiff does not seek avoidance under the Michigan Uniform Voidable Transactions Act as against the Canopy Defendants.

## XI. THE DOMINGUE–MORRIS CONFLICT RECORD AS EVIDENCE OF ENTERPRISE KNOWLEDGE AND INEQUITABLE CONDUCT

78. The facts pleaded in this Section are offered as evidence in support of Count I (willfulness and the unclean-hands rebuttal pleaded in Paragraph 58B) and of the knowledge, coordination, and concealment elements of the RICO counts; no separate count for breach of fiduciary duty is pleaded in this action.

79. Defendants Domingue, Morris, and Cannabis Legal Group owed Plaintiff fiduciary duties of loyalty and confidentiality arising from the attorney-client

relationship established when Plaintiff paid Cannabis Legal Group for legal consultation conducted by Domingue concerning the GAGE Marks dispute.

80. Defendants breached the common-law fiduciary duties of loyalty and confidentiality owed to a former client by Defendant Domingue's subsequent representation of adverse parties (Defendant Gage Growth Corp., including under its former name Wolverine Partners Corp.) in the same GAGE Marks dispute, without disclosure to Plaintiff or Plaintiff's written informed consent. Michigan Rules of Professional Conduct 1.9 and 8.4(c) are pleaded not as an independent cause of action — Michigan does not recognize a private right of action for a disciplinary-rule violation — but as evidence of the standard of care and the scope of the fiduciary duties that the common-law attorney-client relationship imposes.

81. The disclosure and use of Plaintiff's confidences to Plaintiff's detriment (Paragraphs 52A–54; [Exhibit AA]) is pleaded as evidence of the enterprise's knowledge, coordination, and inequitable conduct, and in further support of the unclean-hands rebuttal pleaded in Paragraph 58B and the willfulness pleaded in Count I.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

**A.** A permanent injunction restraining each Defendant, and all persons acting in concert with any Defendant, from using the GAGE Marks or any confusingly-similar designation in commerce in connection with cannabis goods and services;

**B.** An order enjoining Defendants' registration, use, or trafficking in the domain names identified in Paragraphs 55–56 and 61–65, and directing their cancellation or such other disposition as the Court considers just and equitable;

**C.** An accounting and disgorgement of Defendants' profits under 15 U.S.C. § 1117(a) attributable to the infringing use of the GAGE Marks, in an amount to be proven at trial; Plaintiff does not seek the entire acquisition consideration (Paragraph 41) as § 1117 profits, that consideration having purchased an operating enterprise beyond the misappropriated mark;

**D.** Damages under the Lanham Act including disgorgement, lost profits, and corrective-advertising relief;

**E.** Treble damages under 18 U.S.C. § 1964(c);

**F.** Avoidance under MCL 566.31 *et seq.* (MCL 566.34, 566.35, 566.37) of the 2025–2026 dissipation transfers pleaded in Paragraphs 16A, 45A, and 76A–

76B, to the extent necessary to satisfy Plaintiff's claim, and imposition of a constructive trust over the specific, identifiable, traceable proceeds of the misappropriated GAGE Marks — traced from the September 16, 2019 transfer into Wolverine Partners Corp. / Gage Growth Corp. and realized in part in the March 10, 2022 TerrAscend acquisition consideration — in which Plaintiff asserts a pre-existing equitable and beneficial interest, together with attachment of and an injunction against further disposition of those traceable proceeds under MCL 566.37(1)(b)–(c);

**G.** Compensatory damages in an amount to be determined at trial;

**H.** Pre-judgment and post-judgment interest at the maximum lawful rate;

**I.** Reasonable attorneys' fees and costs under 15 U.S.C. § 1117(a), 18 U.S.C. § 1964(c), and applicable Michigan law; and

**J.** Such other and further relief as this Court considers just and equitable.

## XIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,
/s/ Michael Fong
Michael Fong
In Propria Persona (Self-Represented Plaintiff)
4225 Miller Road, Suite 9, #131
Flint, Michigan 48507
(810) 444-0118
michael@gagegreengroup.com
Dated: August 17, 2026

## VERIFICATION

I, Michael Fong, declare under the penalties of perjury under 28 U.S.C. § 1746 that I have read the foregoing First Amended Verified Complaint and that the factual allegations stated herein are true and correct based upon my personal knowledge of the matters described, and as to those matters stated upon information and belief, I am informed of the specific primary-source-anchored evidence supporting each such allegation and I believe each such allegation to be true.

Dated this 17th day of August, 2026.
/s/ Michael Fong
Michael Fong
In Propria Persona (Self-Represented Plaintiff)
4225 Miller Road, Suite 9, #131
Flint, Michigan 48507
(810) 444-0118
michael@gagegreengroup.com

## CERTIFICATE OF SERVICE

I, Michael Fong, appearing in propria persona, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing **First Amended Verified Complaint** (together with Plaintiff's Exhibits as identified in the accompanying Exhibit Index, Bates-numbered GVF 000001 through GVF 002071) to be served upon each Defendant identified below by the methods indicated:

| Defendant | Service Method | Address |
|---|---|---|
| TerrAscend Corp. (Ontario, Canada) | Hague Convention Art. 5(a) Ontario Central Authority / Art. 10(b) process server; FRCP 4(d) waiver in parallel | 77 City Centre Drive, Suite 501 – East Tower, Mississauga, ON L5B 1M5, Canada |
| Gage Growth Corp. (n/k/a TerrAscend Growth Corp.; f/k/a Wolverine Partners Corp.) (Ontario) | Hague Art. 5(a)/10(b) | Current Ontario (OBCA) registered office — to be confirmed from the Ontario Business Registry before service (prior Toronto/Ottawa addresses of record are stale) |
| Radicle Cannabis Holdings Inc. (n/k/a Noya Holdings Inc.) (Ontario) | Hague Art. 5(a)/10(b) | Current Ontario registered office — to be confirmed from the Ontario Business Registry before service |
| Radicle Medical Marijuana Inc. (n/k/a Noya Cannabis Inc.) (Ontario) | Hague Art. 5(a)/10(b) | Current Ontario registered office — to be confirmed from the Ontario Business Registry before service |
| AEY Holdings LLC (Michigan) | FRCP 4(h)(1)(B) — resident agent of record | Capitol Corporate Services, Inc., 186 N Main St, 2nd Fl, Ste 1, Plymouth, MI 48170 (per MI LARA annual statement, Entity 802128796) — and, to the extent required, the receiver in Oakland County No. 2026-222791-CB |
| AEY Capital LLC (Michigan) | FRCP 4(h)(1)(B) — resident agent of record | Capitol Corporate Services, Inc., 186 N Main St, 2nd Fl, Ste 1, Plymouth, MI 48170 (per MI LARA annual statement, Entity 802133602) — and, to the extent required, the receiver in Oakland County No. 2026-222791-CB |
| Spartan Partners Corporation (Michigan) | FRCP 4(h)(1)(B) — resident agent of record | Capitol Corporate Services, Inc., 186 N Main St, 2nd Fl, Ste 1, Plymouth, MI 48170 (MI LARA entity number to be confirmed before service) |
| Spartan Partners Holdings LLC (Michigan) | FRCP 4(h)(1)(B) — resident agent of record | Capitol Corporate Services, Inc., 186 N Main St, 2nd Fl, Ste 1, Plymouth, MI 48170 (MI LARA entity number to be confirmed before service) |
| Cookies Creative Consulting & Promotions, Inc. (California No. C4637839; successor by conversion to Cookies Creative Consulting & Promotions LLC) | FRCP 4(h)(1)(B) — serve CA agent for service | eResidentAgent, Inc. (agent of record for the Inc.); do not serve the defunct LLC |
| Cookies SF LLC (California) | FRCP 4(h) corporate service | Per CA SOS records |
| Canopy Growth Corporation (Canada, CBCA) | Hague Art. 5(a)/10(b); FRCP 4(d) waiver in parallel | Registered office 1 Hershey Drive, Smiths Falls, ON K7A 0A8 — confirm via Corporations Canada before service |
| RIV Capital Inc. (f/k/a Canopy Rivers Inc.) (Ontario) | Hague Art. 5(a)/10(b) | Registered office 365 Bay Street, Suite 800, Toronto, ON M5H 2V1 — confirm the current registered office/agent within the Fluent (Cansortium) group following the December 19, 2024 acquisition (Paragraph 18B) before service |

| | | |
|---|---|---|
| Canopy USA, LLC (United States) | FRCP 4(h)(1)(B) — registered agent of record | State of organization and registered agent to be confirmed from the applicable U.S. corporate registry before service (Paragraph 18C) |
| Barton W. Morris, Jr. (Michigan attorney P54701) | FRCP 4(e) / MCR 2.105(A) personal service | 520 N Main St, Ste A, Royal Oak, MI 48067 |
| Cannabis Legal Group (Michigan law-firm entity) | FRCP 4(h)(1)(B) — resident agent of record | Barton W. Morris, Jr., 520 N Main St, Ste A, Royal Oak, MI 48067 — exact registrable entity form to be confirmed from MI LARA before service |
| Jason Wild (TerrAscend Executive Chairman) | FRCP 4(e)(2) personal delivery | 1051 N Venetian Drive, Miami Beach, FL 33139 (defendant personally signed for Plaintiff's certified pre-suit demand at this address) |
| Bruce Linton (former Canopy CEO; Executive Chairman Gage Growth) | Hague Art. 10(b) process server (Ontario) | Ottawa, ON residence — to be confirmed before service |
| Lynn Gefen (TerrAscend CLO/CPO) | FRCP 4(e) personal service | 6 Hermit Ct, Westport, CT 06880-1112 (per attorney-registration address of record) |
| Michael Hermiz (Wolverine/Gage co-founder & director) | FRCP 4(e) / MCR 2.105(A) personal service | 3663 Piccadilly Drive, Rochester Hills, MI 48309 (prior 47331 Caylee Dr sold 2023-01-27 — do not serve there) |
| Fabian Monaco (Gage Growth President) | Hague Art. 10(b) process server (Ontario) — NOT CT Corporation (rejected "Not Agent," 2026-05-14) | Toronto, ON registered office — to be confirmed before service |
| David Watza (Gage Growth CFO) | FRCP 4(e) personal service | Michigan dwelling — to be confirmed before service (SEC address 47827 Halyard Dr, Plymouth is a defunct former employer — do not serve there) |
| Michael Finos (Gage Growth President (USA), EVP, Director) | FRCP 4(e) personal service | Michigan dwelling (Utica, Macomb County) — to be confirmed before service |
| Rami Reda / Youssef Reda / Ziad Reda (Hamilton, ON) | Hague Art. 10(b) process server / Art. 5(a) | Hamilton, ON — registered office / residence to be confirmed before service |
| Ziad Ghanem (TerrAscend CEO & President) | FRCP 4(d) waiver via counsel; Hague Art. 5(a)/10(b) fallback | c/o TerrAscend Corp., 3610 Mavis Road, Mississauga, ON L5C 1W2 (no U.S. dwelling of record) |
| Gilbert Milam, Jr. ("Berner") | FRCP 4(e) personal delivery, or Cal. CCP § 415.20 substituted service at place of business | Cookies Creative, 2352 Circadian Drive, Santa Rosa, CA 95407 (residence to be confirmed) |
| Jennifer Lynn Domingue (n/k/a Jennifer Lynn Smith) | FRCP 4(e) personal service | 1743 Maplelawn Dr, Troy, MI 48084-4603 (per SBM member directory) |

Service receipts and proofs of service for each Defendant shall be filed with the Court as separate proof-of-service exhibits upon return.

Dated: August 17, 2026
/s/ Michael Fong

Michael Fong
In Propria Persona (Self-Represented Plaintiff)
4225 Miller Road, Suite 9, #131
Flint, Michigan 48507
(810) 444-0118
michael@gagegreengroup.com